### In re NORTH AMERICAN ACCEPTANCE CORPORATION SECURITIES CASES.

**Civ. A. No. C74–193 et al.**

United States District Court, N. D. Georgia, Atlanta Division.

March 30, 1981.

---

Robert W. Beynart, Smith, Cohen, Ringel, Kohler & Martin, Atlanta, Ga., Harold F. McGuire, Jr., Barthold & McGuire, New York City, Fred L. Somers, Jr., Somers & Altenbach, Edwin Marger, Law Offices of Edwin Marger, Atlanta, Ga., for plaintiffs.

Oscar N. Persons, Alston, Miller & Gaines, Atlanta, Ga., for Security Mortgage Investors.

Hugh W. Gibert, Haas, Holland, Levison & Gibert, Atlanta, Ga., for Sol Blaine.

Richard H. Sinkfield, Atlanta, Ga., for Marshall S. Cogan, James J. Ling, W. H. Tinsley, Clyde Skeen and Herman J. Ruppel, H. Bascom Thomas and The First Nat. Bank of Dallas, as Independent Co-Executors of the Estate of A. Pollard Simons.

Gerald A. Friedlander, Nall & Miller, Atlanta, Ga., for Herbert S. Perman.

John A. Chandler, Sutherland, Asbill & Brennan, Atlanta, Ga., for Shearson Hayden Stone, Inc.

A. Timothy Jones, Rosemary Lawlor, Freeman & Hawkins, Atlanta, Ga., James E. Tolan, Christopher Brady, Olwine, Connelly, Chase, O'Donnell & Weyher, New York City, for Arnall, Golden & Gregory.

Geoffrey M. Kalmus, Nickerson, Kramer, Lowenstein, Nessen, Kamin & Soll, New York City, for Robert K. Lifton, Ira J. Hechler and Howard L. Weingrow.

James N. Whitson, pro se.

Richard L. Thomas, pro se.

E. McIntosh Cover, pro se.

Michael N. Mantegna, Atlanta, Ga., for Mrs. A. J. Gonter, intervenor.

Jack M. McLaughlin, Atlanta, Ga., for Omega-Alpha, Inc.

Hugh O. Brock, III, pro se.

Tom Watson Brown, Cofer, Beauchamp & Hawes, Atlanta, Ga., for Bozell & Jacobs, Inc.

Richard M. Kirby, Hansell, Post, Brandon & Dorsey, Atlanta, Ga., for The First Nat. Bank of Atlanta and First Nat. Holding Corp.

William H. Schroder, Jr., Killorin & Schroder, Atlanta, Ga., for Semorco, Inc., Smith Barney Real Estate Corp. and Smith Barney, Harris Upham & Co., Inc.

Robert E. Hicks, Hicks, Maloof & Campbell, Atlanta, Ga., for North American Acceptance Corp.

Gene B. McClure, O'Callaghan, Saunders, Sutter & Stumm, Atlanta, Ga., for Bernes & Kerker.

James William Harris, Sr., North American Acceptance Corp., pro se.

David L. Troughton, pro se.

John T. Jones, pro se.

Michael C. Russ, King & Spalding, Atlanta, Ga., for Touche Ross & Co.

### ORDER

MOYE, Chief Judge.

This case arises out of the sale of Thrift Notes, Thrift Certificates, and Term Notes to the plaintiff class from 1966 until 1974 by the North American Acceptance Corporation (NAAC). The plaintiff class brought

claims for losses in their note purchases against several defendants, including the law firm of Arnall, Golden and Gregory (AGG); Touche Ross and Company, an accounting firm (Touche Ross); and The First National Bank of Atlanta and its holding company, the First National Holding Corporation (FNB). Plaintiffs' claims against these defendants are based on alleged violations of state and federal securities statutes and on alleged breaches of fiduciary and contractual duties. Before the Court are numerous motions to dismiss certain claims, for partial summary judgment, and for summary judgment both by the three defendants listed above and on behalf of the plaintiff class.

## PLAINTIFFS' CONTENTIONS

Plaintiffs' original complaint and the amendments thereto make the following allegations: Count I alleges that the defendants directly and/or indirectly as aiders and abettors, co-conspirators and/or as controlling persons [1] pursuant to section 15 of the Securities Act of 1933 (Securities Act), 15 U.S.C. § 77o, are jointly and severally liable to plaintiffs in an amount exceeding $40,-000,000, the consideration paid for unregistered securities, with interest thereon, as the result of violations of sections 5 and 12(1) of the Securities Act, 15 U.S.C. §§ 77e and 77l(1). Count II alleges that the defendants directly and/or indirectly as aiders and abettors and as controlling persons [2] pursuant to section 15 of the Securities Act and section 15 (sic) [3] of the Securities Exchange Act of 1934 (Exchange Act), 15

U.S.C. § 78t, are jointly and severally liable to plaintiffs for the amount listed above in Count I as the result of violations of sections 12(2) and 17(a) of the Securities Act, 15 U.S.C. §§ 77l(2) and 77q(a), and section 10(b) of the Exchange Act, 15 U.S.C. § 78j, and Rule 10b–5 promulgated thereunder by the Securities and Exchange Commission (SEC). Count III alleges that the defendants, as officers, directors, agents and controlling persons of NAAC who participated in the sale of its Thrift Notes and Term Notes are jointly and severally liable to plaintiffs for the amount listed above in Count I as the result of violations of sections 11 and 13 of the Georgia Securities Act of 1957 (the Georgia Act). Count IV alleges that the defendants as officers, directors, agents, and controlling persons of NAAC who participated or aided or abetted in the sale of its Thrift Notes are jointly and severally liable to purchasers of those Thrift Notes in an amount exceeding $25,-000,000, as the result of violations of section 3 of the Georgia Act. Count V alleges that all defendants except GCI, Varner, Burton and DeCarlo (who are not now before the Court on a motion) are jointly and severally liable to plaintiffs who purchased NAAC Term Notes pursuant to a prospectus dated February 26, 1973, as the result of said defendants' violation of section 13 of the Georgia Act in that said prospectus did not contain audited financial statements as required by section 3 of the Georgia Act. Count VI alleges that defendant Touche Ross is liable to plaintiffs for the amount listed in Count I for violations of section 12(1) of the Securities Act, section 10(b) of

---

1. When defendant AGG was added as a defendant through a second amendment to the consolidated amended complaint—class action on June 18, 1975, no specific allegation was made that AGG was a controlling person of NAAC. The amendment did refer, however, to Counts I, II, III, IV, V, VI, and VIII of the Consolidated Amended Complaint Class Action, as amended, which did allege all defendants to be controlling persons. The question of who plaintiffs contend are liable to them as controlling persons under the federal securities laws was settled in plaintiffs' supplemental answers to defendants' first joint interrogatories, filed April 22, 1977. In responses to two questions (¶¶ 4(e) and 16(e)) the plaintiffs replied that the

following defendants are the only ones against whom they asserted controlling person claims: Officers and Directors of NAAC; Omega-Alpha, Inc.; Officers and Directors of Omega-Alpha, Inc.; GCI International, Inc.; and Officers and Directors of GCI International, Inc. Therefore, no controlling person issues are presently before the Court.

2. See note 1 supra.

3. Even though the plaintiffs misstated the controlling person section of the Exchange Act as section 15 rather than as section 20, they did correctly cite the section as 15 U.S.C. § 78t.

the Exchange Act and Rule 10b–5 promulgated thereunder and Section 11 of the Georgia Act. Count VII alleges that defendant FNB is liable to those plaintiffs holding Term Notes and all other Term Note holders of NAAC in an amount exceeding $15,000,000, for breaches of contractual and fiduciary obligations and duties arising out of an indenture agreement between NAAC and FNB. Finally, Count VIII[4] alleges that defendants AGG, NAAC, and FNB are liable to plaintiffs in the amount of $10,000,000 for failure to qualify the indenture agreement pursuant to section 306(a) of the Trust Indenture Act of 1939, 15 U.S.C. § 77fff(a).

## FACTUAL OUTLINE

NAAC was organized in 1963 when its then-parent, Transcontinental Investing Corporation (TIC), acquired the business and assets of a Pennsylvania finance company with headquarters in Atlanta, named North American Acceptance Corporation. TIC retained the name and formed a new Georgia corporation which continued in business until it filed a bankruptcy petition on February 6, 1974.

NAAC engaged principally in making first and second mortgage loans on residential properties and servicing the receivables that it generated. In addition, it bought in bulk from home improvement contractors and acquired other receivables secured by home mortgages. It serviced this paper in the same fashion as on the loans it made itself.

In 1966 NAAC began selling what it called Thrift Notes to the public. Thrift Notes were simply promissory notes issued by NAAC payable to the order of the purchaser, bearing specified maturity dates nine months from the date of purchase but redeemable upon demand of the holder. Thrift Notes were never registered with any governmental authority and were sold continuously from 1966 until February 1974.

NAAC sold Term Notes from July 1971 through May 1973. These notes were promissory notes payable one to five years after the date of sale. These notes were registered with the Georgia Commissioner of Securities and were sold pursuant to a prospectus.

Thrift Certificates, which NAAC began marketing in July 1973 were identical to Thrift Notes except that they were not payable on demand. Like Thrift Notes, they were not registered with any governmental authority.

All of these notes were sold only in Georgia to Georgia residents. Because of that fact NAAC saw no need to register the notes with the Securities Exchange Commission because of the exemption provided to securities sold only intrastate by section 3(a)(11) of the Securities Act. In addition, NAAC saw no need to register the Thrift Notes or Certificates with the Georgia Securities Commissioner because it relied on section 5(g) of the Georgia Securities Act of 1957 which exempted the registration of commercial paper maturing in not more than twelve months from date of issuance.

In 1968 NAAC organized Security Mortgage Investors (SMI), a Massachusetts real estate investment trust headquartered in New York. From 1969 to 1972 NAAC owned about 46 percent of the beneficial shares of SMI. SMI became NAAC's primary customer for the sale of NAAC's receivables. In addition, NAAC, by virtue of its stock in SMI, received 46 percent of all dividends declared by SMI. Consequently, NAAC's relationship with SMI had the practical effect of providing NAAC a steady source of cash, through the sale of receivables and receipt of dividends.

In 1969 and 1970, NAAC entered the real estate business. By early 1971, NAAC had acquired real estate in states other than Georgia, including Arizona, Mississippi, Washington, and Hawaii. This acquisition occurred as a result of the financial difficulties and eventual bankruptcy of a group of companies (the Wendell-West group) from which NAAC had purchased substantial

---

**4.** Count VIII was added on June 18, 1975, in the same amendment which added AGG as a defendant.

amounts of land sales contracts and to which NAAC had made available substantial lines of credit. NAAC acquired this out-of-state real property in settlement of its claims under the land sales contracts it had purchased. NAAC then formed a number of wholly-owned subsidiaries which were in the business of developing and selling lots on the real estate it had acquired. The land companies proved to be a cash drain on NAAC, requiring the infusion of millions of dollars to meet development obligations.

In March 1972, Omega-Alpha, Inc. (O–A), acquired NAAC through a merger with Transcontinental Investing Corporation (TIC). O–A was a Delaware Corporation organized in November 1970 and conducting business exclusively through its subsidiaries. O–A quickly caused a depletion of NAAC's cash and other reserves through transfers of securities, dividends paid to O–A, and loans to O–A. A description of these transfers can be found in Form 10–K, filed by O–A with the SEC for the fiscal year ended June 30, 1972, at pp. 16–17. (Ex. C to Affidavit of Robert W. Beynart, filed October 15, 1980).

Meanwhile, NAAC lost its favorable position with SMI. A mid-1972 merger agreement joined SMI with another real estate investment trust, Medical Mortgage Investors, to create a new SMI. As a result of this transaction NAAC had no equity in the new SMI. In November 1972, O–A's chief, James J. Ling, committed NAAC to selling $50,000,000 in receivables to SMI at rates favorable to SMI.

In 1973 NAAC's financial condition began to deteriorate. In January, SMI announced that it would no longer purchase paper from NAAC. Also in January, the SEC proposed Rule 147, which would create explicit location-of-assets and use-of-proceeds criteria relating to the intrastate exemption from registration of securities embodied in section 3(a)(11) of the Securities Act. It seemed unlikely that NAAC could meet those criteria and consequently NAAC's unregistered note sales would have to cease if the Rule were formally adopted.

In March 1973, Touche Ross prepared financials which restated the past five years' operations. These financials showed that under newly required accounting guidelines NAAC's overall operations for that period were virtually at the "break-even" point. In addition, NAAC had lost money in the second half of 1972, and the auditors expressed doubt about the value of $12,144,-000 in notes from O–A. By May 1973, NAAC's principal source of funds to repay holders of maturing Thrift and Term Notes was the sale of additional Thrift Notes. These were not sold pursuant to any registration statement. They were primarily sold through television, newspaper, and direct mail solicitation.

NAAC was sold by O–A to GCI International, Inc., of Los Angeles in August 1973. GCI was primarily a wholesale agent for the sale and subsequent development of large parcels of unimproved land in Hawaii and the western United States. September brought some relief for NAAC; SMI agreed to purchase $15,000,000 of paper over the coming months. The relief was short lived, however. In December 1973, the SEC recommended an investigation into NAAC's note sales, and on January 7, 1974, Rule 147 was adopted effective March 1, 1974.

NAAC's financial collapse came early in 1974. Touche-Ross issued a report on January 15, 1974, in which it outlined NAAC's shaky financial status and found itself unable to express an opinion on the consolidated financial statements for the year ended June 30, 1973. The financials were mailed to noteholders on February 1, 1974. Shortly thereafter the noteholders' demands for payment exceeded NAAC's ability to pay, and on February 6, 1974, NAAC filed a petition under Chapter XI of the Bankruptcy Act, proceedings which were later converted to Chapter X proceedings. The collapse of NAAC was followed by the filing of this action by the noteholders as a class who were unable to collect the full face value of their notes through the bankruptcy proceedings.

ARNALL, GOLDEN AND GREGORY

AGG was named as a defendant in Counts I, II, III, IV, V, VI and VIII through an amendment to the Consolidated Amended Complaint—Class Action as outlined above. The amendment adding AGG was filed June 18, 1975; however, for statute of limitations purposes, AGG became a defendant on February 1, 1975.[5] The complaint alleges that AGG served as the attorney for NAAC throughout the period during which the facts as outlined above unraveled. AGG, it alleges, participated in the preparation and promulgation of the advertising used in connection with the sale of the Thrift Notes and Term Notes sold by NAAC. Its activity included but was not limited to approval, disapproval, and direction as to the content of said advertising when it knew or should have known the advertising omitted to state material facts necessary in order to make the statements made in light of the circumstances under which they were made, not misleading, and when it knew or should have known that the advertising amounted to an act, practice or a course of business which operated as a fraud and deceit upon the purchasers of Thrift Notes and Term Notes. The complaint further alleges that AGG further participated and assisted in the preparation of and permitted the use of materially misleading and false prospectuses and other written literature which was used by NAAC in connection with the sale of the Thrift Notes and Term Notes when AGG knew or should have known that the information being included in the prospectuses and other written material omitted to state material facts necessary in order to make the statements made in light of the circumstances under which they were made, not misleading and amounted to an act, practice or a course of business which operated as a fraud or deceit upon the purchasers of thrift notes and term notes. In addition, plaintiffs allege that AGG issued legal opinions to the effect that Thrift Notes and Term Notes were exempt from the registration provisions of the Securities Act and that Thrift Notes were exempt from the registration provisions of the Georgia Securities Act at a time when it knew or should have known that these notes were not so exempt. It is further alleged that defendant AGG prepared and approved a trust indenture, under which defendant FNB operated as trustee, without having said trust indenture qualified pursuant to the terms of the Trust Indenture Act of 1939, 15 U.S.C. § 77aaa *et seq.*, when AGG knew or should have known the Act required the indenture to be so qualified.

Defendant AGG has moved for judgment on the pleadings and summary judgment dismissing plaintiffs' claims under the federal and state securities laws, and for summary judgment dismissing or limiting plaintiffs' claims under the applicable statutes of limitation.

*Federal Securities Laws.* AGG contends that all plaintiffs' claims under the federal securities laws must be dismissed because (1) there is no private right of action under sections 5 and 17(a) of the Securities Act; (2) AGG is not a proper party-defendant to a claim under section 12 of the Securities Act or section 306(a) of the Trust Indenture Act; and (3) plaintiffs have no implied right of action against AGG under section 10(b) of the Exchange Act or Rule 10b–5 promulgated thereunder.

AGG first argues that plaintiffs' claims under section 5 of the Securities Act must be dismissed because there is no private right of action under that section. Defendant argues that under the analysis contained in the court's decision in *Unicorn Field, Inc. v. Cannon Group, Inc.*, 60 F.R.D. 217 (S.D.N.Y.1973), private civil liability for violations of sections 5 and 17(a) of the Securities Act exists only when the provisions of section 12 are also met. In simple terms, section 5 of the Securities Act makes unlawful the sale of unregistered securities

---

**5.** On January 10, 1975, AGG agreed with plaintiffs' counsel to toll the running of the statutes of limitations applicable to plaintiffs' claims under the federal and state securities laws for a period of sixty days beginning February 1, 1975. Two extensions followed which finally extended the tolling period to June 20, 1975.

through the use or medium of any prospectus or otherwise in interstate commerce or through the mails unless the security is exempted by section 3 of the Act or the transaction is exempted by section 4. Section 12 makes liable to the purchaser any person who offers or sells a security in violation of section 5 or a person who offers or sells a security in interstate commerce by means of a prospectus which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made not misleading. In addition, section 17(a), in summary, makes it unlawful for any offeror or seller of securities to employ any device or scheme that would operate as a fraud or deceit upon the purchaser.

■ The Court does not disagree with defendant AGG that no civil liability arises solely as a result of a violation of section 5. Plaintiffs, however, have alleged that as a result of NAAC's failure to register any of its notes with the SEC, AGG is civilly liable to plaintiffs under section 12 as an aider and abettor and a participant. Section 12 specifically refers to registration as required by section 5 and plaintiffs' reference to section 5 is solely with respect to their claims under section 12. Defendant's argument that plaintiffs' claims under section 5 are invalid is misplaced inasmuch as plaintiffs have made no claim under that section alone. Accordingly, defendant AGG's motion for judgment on the pleadings and summary judgment under section 5 of the Securities Act is DENIED.

■ The Court does, however, find merit in defendant's motion with respect to section 17(a) of the Securities Act. In *Gunter v. Hutcheson*, 433 F.Supp. 42 (N.D.Ga.1977), this Court analyzed the question of whether an implied private cause of action arises under that section. The Court therein concluded that no such cause of action arose from the language of section 17. *Id.* at 47. The Fifth Circuit Court of Appeals has declined to decide the issue, *see Pharo v.*

*Smith*, 621 F.2d 656, 673 (5th Cir. 1980), and unless and until that court decides the issue differently than did this Court in *Gunter* this Court will continue to hold that section 17 implies no private right of action. Defendant AGG's motion for judgment on the pleadings and for summary judgment with respect to section 17 of the Securities Act is therefore GRANTED. Accordingly, that portion of Count II alleging violations by AGG of section 17(a) is hereby dismissed.

The next contention of AGG to be considered is whether AGG is a proper party defendant to plaintiffs' claims under section 12 of the Securities Act. Section 12, as noted above, provides civil liability for any person who *offers or sells* a security in violation of section 5, or who *offers or sells* a security by means of a prospectus or oral communication which includes an untrue statement of a material fact or omits to state a material fact necessary in order to make the statements made not misleading.

■ AGG contends first that plaintiffs have abandoned their claims that AGG sold to plaintiffs or caused to be sold to plaintiffs the notes that NAAC issued by virtue of their answers to Defendants' First Joint Interrogatories. While plaintiffs did state in response to questions 2(a) and 2(b) to those interrogatories that they contended that NAAC was the seller of the notes plaintiffs purchased and that those who caused notes to be sold to plaintiffs were limited to officers and directors of NAAC, O–A and its officers and directors, and GCI and its officers and directors, nevertheless the plaintiffs also alleged in response to question 4(b) that AGG, FNB, and Touche Ross, *inter alia*, were aiders and abettors of NAAC's violations of sections 5 and 12(1). Therefore, the Court will consider the merits of defendant's motion for judgment on the pleadings and summary judgment with respect to plaintiffs' claims under section 12 of the Securities Act, for it does not believe those claims have been abandoned.[6]

---

**6.** Indeed, plaintiffs allege in response to question 4(b)(i)(7) of Defendants' First Joint Interrogatories that:

"AGG was general counsel to NAAC during all periods in which Thrift and Term Notes were sold by NAAC. AGG took affirmative

It is clear that in order to prove a violation of section 12 of the Securities Act plaintiffs are not required to show privity between purchasers and seller. In *Hill York Corp. v. American International Franchises, Inc.*, 448 F.2d 680 (5th Cir. 1971), the court held that privity between a purchaser and a person held liable under section 12 is not required if the injury to the plaintiff-purchaser flowed directly and proximately from the actions of the defendant. *Id.* at 693. In *Lewis v. Walston & Co.*, 487 F.2d 617 (5th Cir. 1973), this test was recast as follows: were the defendant's actions "a substantial factor in bringing about the plaintiff's purchases." *Id.* at 622. The Fifth Circuit reiterated the substantial factor test in *Pharo v. Smith*, 621 F.2d 656 (5th Cir. 1980), and added clarifying language: "Mere participation in the events leading up to the transaction is not enough." *Id.* at 667.

The latest Fifth Circuit case discussing the possibility of a person being held liable under section 12 without being an immediate party to the buy-sell agreement is *Croy v. Campbell*, 624 F.2d 709 (5th Cir. 1980). In *Croy* the plaintiffs alleged that a lawyer whom they had consulted for tax advice was a seller of an alleged security since he introduced them to the immediate owner of the alleged security and told them the alleged security was the best investment they could make from a tax standpoint. The court held that "[p]articipation in the sale of a security ... is an important factor only as it relates to the concept of causation. A determination that one has participated in the transaction should not be conclusive as to the participant's liability as a seller, but it may be a criterion in determining whether or not the defendant caused the transaction to take place." *Id.* at 714. While the court in *Croy* stated that its

holding should not be interpreted to mean that a lawyer who participates in the transaction can *never* be a seller for purposes of section 12, it held that the lawyer therein was not the cause of plaintiff's purchase and therefore not a seller. *Id.*

In reliance on *Croy*, this Court held in *Westlake v. Abrams*, 504 F.Supp. 337 (N.D. Ga., 1980), that an attorney who acted as general counsel to a seller of commodity futures options was not a "seller" for purposes of section 12 despite his knowledge of boiler-room sales tactics used by the seller, his representation of the seller in proceedings to force a telephone company to supply telephones to the seller for the purpose of making sales, his arrangement for registration under state securities laws of the sale of options, and his acquisition of office space for the seller's activities. *Id.* at 347. The attorney, the Court held, did not cause the plaintiff to purchase the options despite his efforts on behalf of the actual seller.

In response to defendant's motion to dismiss plaintiffs' claims under section 12, the plaintiffs argue that defendant AGG is a seller under *Pharo, Lewis,* and *Hill York* because AGG's activities with respect to NAAC were a "substantial factor" in the sale of NAAC notes. Plaintiffs contend that AGG's January and February 1974 advice to NAAC to continue to sell notes based on the intrastate exemption to the securities laws and its advice in January and February 1973, concerning the applicability of the intrastate exemption create factual questions for resolution at trial as to whether AGG's activities meet the substantial factor test.

The plaintiffs failed to brief the more recent case of *Croy* in which the court held that participation in the sale of a security is not conclusive as to the partici-

actions to facilitate the sale of said notes by NAAC, including the review of virtually all advertising used in connection therewith and the preparation of an inaccurate opinion letter to the effect that no registration was necessary for the Term Notes. AGG consented to the use of its name in NAAC sales literature, namely the prospectus. Defendant Brock was reflected on AGG's letterhead

as a member of that firm, and in addition, had a permanent office at NAAC's Atlanta office and was compensated by NAAC. At the time of taking such actions, AGG knew or should have known that the Notes were not registered under the Securities Act of 1933 and were not exempt from registration."

Filed April 22, 1977.

pant's liability as a seller, but participation is a mere criterion to be used to determine whether the defendant *caused* the transaction to take place. 624 F.2d at 714. As in *Westlake*, the Court today is unable to find that on the voluminous factual record before it that defendant AGG could be found at trial to have caused the plaintiffs to make their purchases of NAAC simply because it advised NAAC that the intrastate exemption was available and applicable and it advised NAAC to continue selling notes in a period of financial instability. Accordingly, the Court hereby GRANTS defendant AGG's motion to dismiss and for summary judgment with respect to plaintiff's claims under section 12 of the Securities Act. In doing so, under the holding in *Pharo*, the Court likewise finds that AGG could have no liability as an aider and abettor of NAAC's alleged violations of section 12. 621 F.2d at 669.

Defendant AGG next argues that it is not a proper party defendant to plaintiffs' claim under section 306(a) of the Trust Indenture Act. In Count VIII of their complaint, plaintiffs aver that AGG prepared and approved a trust indenture, under which defendant FNB operated as trustee, without having said trust indenture qualified; that failure to qualify the indenture was a violation of section 306(a) of the Trust Indenture Act; and that AGG is therefore liable to all those plaintiffs who purchased Term Notes under the unqualified indenture. While AGG is separately moving for summary judgment on the ground, in part, that Term Notes covered by the trust indenture and thus the indenture itself were exempt from federal registration under the intrastate exemption of the federal securities laws, it also argues here that there is no private right of action under section 306(a) and that under other sections of the Act implied civil liability has only been found to exist with respect to the indenture trustee (FNB).

■ The Court need not today determine whether a private right of action exists under section 306(a) of the Trust Indenture Act, nor whether noteholders may sue one who is an aider, abettor, or participant in a trustee's violation of that section. Those questions need not be reached because section 306(a) makes liable only *sellers* of securities for violating its provisions and the Court, above, has found that AGG was not a seller of NAAC notes, nor was it an aider and abettor in the sale of those notes for purposes of the federal securities laws. *See* 15 U.S.C. § 77fff(a)(1) and (2). Accordingly, the Court GRANTS defendant AGG's motion for summary judgment with respect to the allegations in Count VIII of the complaint lodged against AGG.

■ Finally, defendant AGG has moved for judgment on the pleadings arguing that plaintiffs have no implied private right of action against AGG under section 10(b) of the Exchange Act or Rule 10b–5 promulgated thereunder. The basis for this claim is that there is no reason for the Court to imply a remedy because each allegation of the complaint falls squarely within the purview of the express remedies afforded by other sections of the securities acts. Because the Court has dismissed plaintiffs' claims against AGG under sections 17(a) and 12 of the Securities Act and section 306(a) of the Trust Indenture Act, defendant's argument no longer holds true. In addition, as noted in *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 93 (5th Cir. 1975), by now the existence of an implied right of action under section 10(b) and Rule 10b–5 can hardly be gainsaid. *See also Wachovia Bank & Trust Co. v. National Student Marketing Corp.*, 650 F.2d 342 (D.C.Cir.1980). Therefore, this Court will continue to find an implied cause of action for violations of section 10(b) and Rule 10b–5 and accordingly DENIES defendant's motion to dismiss plaintiffs' claims thereunder.

*Georgia Securities Act.* Plaintiffs assert claims under sections 3, 11, and 13 of the Georgia Securities Act of 1957 as set out in Counts III, IV, V, and VI of their complaint. AGG's motion for judgment on the pleadings and summary judgment dismissing said claims is based on the following grounds: (1) AGG is not a proper party-de-

fendant to a claim under § 13 of the Georgia Securities Act; (2) Plaintiffs' claims in Count IV of their complaint must be dismissed because the failure to register NAAC's Thrift Notes with the Georgia Commissioner was not a violation of section 3 of the Georgia Securities Act since Thrift Notes were exempt from state registration under section 5(g) of the Georgia Securities Act; (3) the financial statements included in the 1973 Term Note Prospectus were "certified" as required by § 3 of the Georgia Securities Act; (4) and plaintiffs have averred no facts and there is no genuine issue of material fact that AGG knowingly subscribed to, or made, or caused to be made, any material false statement or representation in NAAC's financial statements within the meaning of § 11 of the Georgia Securities Act.

Defendants' first argument is that AGG is not a proper party defendant to a claim under section 13 of the Georgia Securities Act, which provides the exclusive remedy for damages for violations of sections 3 and 11. Section 13 of the Georgia Securities Act of 1957 reads in part as follows:

"Every sale or contract for sale in violation of any of the provisions of this Act ... shall be voidable at the election of the purchaser. The person making such sale or contract for sale, and every director, officer, salesman or agent of or for such seller who shall have participated or aided in any way in making such sale, shall be jointly and severally liable to such purchaser in any action at law in any court of competent jurisdiction upon tender to the seller, in person or in open court, of the securities sold or of the contract made for the full amount paid by any such purchaser, together with all taxable court costs and reasonable attorney's fees in any action or tender under this section...."

1957 Ga. Laws, Vol. 1, p. 161. Defendant argues that section 13 confines the class of persons potentially liable for violations of sections 3 and 11 to the seller and "every director, officer, salesman, or agent of or for such seller," a group, defendant asserts, which does not include AGG.

▉ The Court agrees with defendant's argument that the civil remedy for violations of sections 3 and 11 of the Georgia Securities Act of 1957 is exclusively provided by section 13 of that Act. While the new Georgia Securities Act of 1973, Ga. Code Ann. § 97–1 *et seq.*, provides for express civil liability for anyone who violates its general anti-fraud provision (Ga.Code Ann. § 97–112), the 1957 Act, which is applicable to transactions occurring before April 1, 1974, provides for civil liability only as provided for in section 13 thereof. *Kleiner v. Silver*, 137 Ga.App. 560, 561–62, 224 S.E.2d 508 (1976). If section 13 allows no avenue of recovery for plaintiffs against defendant AGG as AGG contends, the Court need not examine the substantive requirements of the Georgia Act which plaintiffs allege AGG has breached. The Court therefore turns to the record before it to determine whether a genuine issue of material fact continues to exist as to whether AGG was a seller, director, officer, salesman or agent of a seller of NAAC notes in order to determine if plaintiffs' substantive claims under the Georgia Act even merit consideration. Since it is undisputed that AGG offered no NAAC notes for sale *directly* to plaintiffs, and was not a director, officer, or salesman of NAAC, AGG cannot be held liable to plaintiffs under section 13 unless it was an "agent of or for such seller who shall have participated or aided in any way in making such sale."

Plaintiffs contend that AGG acted as NAAC's agent with regard to note sales in several instances. First, plaintiffs contend that AGG was NAAC's agent when it first persuaded Commissioner of Securities Ben W. Fortson to accept a Term Note registration of $20,000,000 in 1971. Second, plaintiffs allege that AGG acted as NAAC's agent when it persuaded the SEC to discontinue its inquiry into note sales in 1972. Third, it is alleged that agency with regard to note sales existed when AGG threatened SMI with NAAC's bankruptcy and criminal prosecutions in September of 1973, in a successful attempt to keep NAAC alive for a few months more. Finally, plaintiffs al-

lege that AGG was NAAC's agent in successfully moving to quash the SEC's investigative subpoena in early January, 1974.

Georgia authority is scarce with respect to the question of who constitutes an agent under section 13 of the Georgia Act. While the plaintiffs point to *Boddy v. Theiling*, 129 Ga.App. 273, 199 S.E.2d 379 (1973), the Court finds that case inapplicable here because it merely defined what was meant by section 13's reference to the terms "participated or aided" when applied to a corporate director. Section 13 liability attaches to a director regardless of whether he can be considered an agent of the corporation; *Boddy*, therefore, fails to define "agent." The Court has found one case, *D. K. Properties v. Osborne*, 143 Ga.App. 832, 240 S.E.2d 293 (1977), where "agent" as found in the 1957 Securities Act has been discussed. In *Osborne* the court held that it was error to grant summary judgment for a defendant on the ground that he was not covered by the language of section 13 where the defendant was an assistant secretary of the selling corporation who, as an attorney, assisted in the preparation of the documents closing the sales and signed the closing papers in his capacity as assistant secretary. While the court may have reversed the granting of the motion for summary judgment because the defendant was a corporate officer, it also may have found that a factual question was presented as to whether he was an agent of the seller who participated in any way in making the sale. The opinion is unclear as to the basis of its holding. The court's references to defendant's "participation as the attorney closing the sales and as the signatory officer and assistant secretary of the issue," *Id.* at 837, 240 S.E.2d 293, *seem* to infer that the court found that the presence of all these activities together created a factual question concerning defendant's role as the issuer's agent.

Finding no other cases defining section 13's reference to agency, the Court looks to *Nechtman v. Wellington Plaza, Inc.*, 97 Ga. App. 40, 102 S.E.2d 57 (1958), for an explanation of the elements of an agency relationship under Georgia law. Defendant AGG relies on *Nechtman* and asserts that for an agency to have been established the following must exist: (1) facts from which agency may be established; (2) the principal, through its agent, *must have done* the act; and (3) the act must have been done by the alleged agent in the prosecution of the principal's business and within the scope of his agency. Plaintiffs contend *Nechtman* is not controlling because it specified that the three above-named elements must be *pleaded* in order for a plaintiff relying on a theory of agency to have stated a theory under which he might recover under the former rules of pleading. Despite the posture of *Nechtman* procedurally, it did roughly define the elements of an agency relationship in Georgia. These elements are perhaps more clearly seen in Ga.Code Ann. § 4–101 (1975) which defines agency as follows: "The relation of principal and agent arises whenever one person, expressly or by implication, authorizes another to act for him, or subsequently ratifies the acts of another in his behalf."

Having examined the above cases and the applicable provision of the Georgia Code, the Court must now determine whether, on the record before it, a genuine issue as to a material fact exists with respect to the question of whether defendant AGG was an *agent* of NAAC who participated or aided in any way in making sales of NAAC notes. In order for AGG to be held to be an agent under section 13, one of the following must fulfill the above definition: (1) AGG's persuading the Georgia Commissioner of Securities to accept registration of a NAAC Term Note offering in 1971; (2) AGG's persuading the SEC to discontinue its inquiry into NAAC note sales in 1972; (3) AGG's threatening SMI with NAAC's bankruptcy and criminal prosecutions in September 1973; or (4) AGG's successful move to quash the SEC's investigative subpoena in January 1974. These four factual allegations are the only ones mentioned by plaintiffs in their Brief in Response to Supplementary Motions of AGG where they argue that AGG was NAAC's agent regarding note sales and

consequently are the only ones the Court will examine here. Construing the facts most favorably for the plaintiffs, the Court cannot conclude that any of the above activities by AGG as general counsel to NAAC can be held to have created the relation whereby NAAC authorized AGG to participate or aid in any way in making sales of NAAC notes. Neither do the above facts demonstrate that NAAC has after-the-fact ratified AGG's participation or aid in making sales of NAAC notes, an action which would also have created an agency under section 13. To hold an individual to be an *agent* who has participated or aided in *making sales* of securities, the Court must find that the individual was so entangled in the actual sale of the security that his activities were at least a substantial factor[7] in the purchaser's decision to buy the security and that his activities were either authorized by or ratified by the issuer.[8] The activities of AGG listed above do not meet that level of participation; accordingly, the Court GRANTS defendant AGG's motion for judgment on the pleadings and summary judgment with respect to plaintiff's claims against AGG under the Georgia Securities Act of 1957.

*Rule 10b–5.* Having dismissed plaintiff's claims against AGG under sections 12 and 17 of the Securities Act, section 306(a) of the Trust Indenture Act, and under sections 3, 11, and 13 of the Georgia Securities Act, the Court now considers the final remaining claim against AGG which is predicated on section 10 of the Exchange Act and Rule 10b–5 promulgated thereunder. Having confirmed above that a private cause of action arises thereunder, the Court will examine defendant AGG's motion for summary judgment with respect to section 10.

Plaintiff's joinder of AGG as a defendant to Counts I through IV and VIII of their complaint is based on the following four general factual averments:

1) that AGG "issued opinions" that the Thrift Notes and Term Notes were exempt from the registration provisions of the Securities Act and that the Thrift Notes were exempt from the registration provisions of the Georgia Securities Act, when it knew or should have known that those notes were not so exempt;

2) that AGG "participated in the preparation and promulgation of the advertising used in connection with the sale of the Thrift Notes and Term Notes", including "approval, disapproval, and direction when it knew or should have known" the advertising was misleading, fraudulent, and deceitful;

3) that AGG "participated and assisted in the preparation of and permitted the use of materially misleading and false prospectuses and other written literature" used in connection with the sale of Thrift Notes and Term Notes, when it knew or should have known such literature was misleading, fraudulent, and deceitful; and

4) that AGG "prepared and approved a trust indenture" agreement between NAAC and First National without having it qualified under the Trust Indenture Act, when it knew or should have known that the indenture agreement was required to be so qualified.

Defendant AGG's motion for summary judgment is based on the legal insufficiency of plaintiff's contentions with respect to AGG's acts in light of the facts adduced in discovery and as presented in the affidavit of defendant AGG submitted in support of its motion for summary judgment and annexed exhibits.

---

7. See *Pharo v. Smith*, 621 F.2d 656, 667 (5th Cir. 1980) (holding that mere participation in the events leading up to the transaction is insufficient to hold an individual to be a seller); *Croy v. Campbell*, 624 F.2d 709, 714 (5th Cir. 1980) (holding causation of the sale itself to be the criteria to determine whether a participant is a seller); *D. K. Properties v. Osborne*, 143 Ga.App. 832, 837–38, 240 S.E.2d 293 (1977) (holding that an attorney who prepared documents closing the sale, conducted the closing, and served issuer as assistant secretary and signatory officer *may* have been an agent who participated or aided in making a sale).

8. *See* Ga.Code Ann. § 4–101 (1975).

The Court's consideration of defendant AGG's motion for summary judgment begins with an examination of section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder. Section 10(b) states:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce or of the mails, or of any facility of any national securities exchange—

(b) To use or employ, in connection with the purchase or sale of any security registered on a national securities exchange or any security not so registered, any manipulative or deceptive device or contrivance in contravention of such rules and regulations as the Commission may prescribe as necessary or appropriate in the public interest or for the protection of investors.

The SEC rule promulgated in conjunction therewith reads:

It shall be unlawful for any person, directly or indirectly, by the use of any means or instrumentality of interstate commerce, or of the mails, or of any facility of any national securities exchange,

(1) to make any untrue statement of a material fact or to omit to state a material fact necessary in order to make the statements made, in the light of the circumstances under which they were made, not misleading, or

(3) to engage in any act, practice, or course of business which operates or would operate as a fraud or deceit upon any person, in connection with the purchase or sale of any security.

The Court will first consider the law as it has developed in several recent cases under these provisions and, in view of the law, examine the facts in the record to determine if material facts remain unresolved.

Recently, in *Croy v. Campbell*, 624 F.2d 709 (5th Cir. 1980), the Fifth Circuit stated the elements of a cause of action under section 10(b) and Rule 10b–5 to be:

A misrepresentation or omission or other fraudulent device, the plaintiff's purchase or sale of securities in connection with the fraudulent device, the maturity of the

misrepresentation or omission, the defendant's scienter in making the misrepresentation or omission, the plaintiff's justifiable reliance on the device (or due diligence against it), and the plaintiff's damages resulting from the fraudulent device. *Cameron v. Outdoor Resorts of America, Inc.*, 608 F.2d 187, 193–94 (5th Cir. 1979), aff'd in part, vacated and remanded in part on rehearing, 611 F.2d 105 (5th Cir. 1980), citing *Dupuy v. Dupuy*, 551 F.2d 1005, 1014 (5th Cir.), cert. denied, 434 U.S. 911, 98 S.Ct. 312, 54 L.Ed.2d 197 (1977); *Woodward v. Metro Bank*, 522 F.2d 84, 93 (5th Cir. 1975).

624 F.2d at 715. The court in *Croy* continued:

In *Ernst & Ernst v. Hochfelder*, the Supreme Court defined the requisite state of mind, or scienter, as "a mental state embracing intent to deceive, manipulate, or defraud." 425 U.S. [185] at 194 n. 12, 96 S.Ct. [1375] at 1381 n. 12, 47 L.Ed.2d [668] at 677 n. 12. The court held that negligence will not suffice for the imposition of liability under 10b–5, but it specifically withheld consideration of whether or not reckless behavior was sufficient. This court has recently made clear what it had intimated in the past: that "[t]o sustain a cause of action under [rule] 10b–5, ... plaintiffs must show that defendants intentionally or recklessly failed to disclose material information." *Broad v. Rockwell International Corp.*, 614 F.2d 418, 440 (5th Cir. 1980) (emphasis added). The court also noted, however, that proof of recklessness would require a showing that the defendant's conduct was

an extreme departure from the standards of ordinary care, ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it.

614 F.2d at 440, quoting *Sanders v. John Nuveen & Co., Inc.*, 554 F.2d 790, 793 (7th Cir. 1977).

*Id.* While *Croy* held, in reliance on *Broad v. Rockwell International Corp.*, 614 F.2d

418 (5th Cir. 1980), that to sustain a cause of action under Rule 10b–5 plaintiffs must show defendants either intentionally *or recklessly* failed to disclose material information, *Croy's* reliance on *Broad* was improper. The Fifth Circuit noted in *Dwoskin v. Rollins, Inc.*, 634 F.2d 285 (5th Cir. 1981), that the opinion in *Broad* was vacated under Fifth Circuit Local Rule 17 on June 9, 1980, when the court granted a rehearing en banc.[9] *Id.* at 290 n. 1. Since *Croy* was not decided until August 22, 1980, *Broad* was not authority for its holding. The matter is now settled, however, for in *G. A. Thompson & Co., Inc. v. Partridge*, 636 F.2d 945 (5th Cir. 1981), the court held that the *severe recklessness* standard which was implicitly adopted in *S.E.C. v. Southwest Coal & Energy Co.*, 624 F.2d 1312 (5th Cir. 1980), would fulfil the requirement of *Ernst & Ernst v. Hochfelder*, 425 U.S. 185, 193 n. 12, 96 S.Ct. 1375, 1381 n. 12, 47 L.Ed.2d 668 (1976), that scienter be present on the part of the defendant before it is held liable under section 10(b) on Rule 10b–5. The court in *Partridge* stated in support of its additional holding that recklessness suffices to prove a cause of action against a controlling person that had Congress meant to require intentional misdoing in that context it would have done so explicitly. 636 F.2d at 960. Apparently the observation is applicable likewise to the violator of Rule 10b–5.

█ The severe recklessness standard adopted in *Partridge* is defined as follows: Proof of recklessness would require a showing that the defendant's conduct was an extreme departure from the standards of ordinary care, ... which presents a danger of misleading buyers or sellers that is either known to the defendant or is so obvious that the actor must have been aware of it. Id. at 962, *quoting Southwest Coal* at 1321 n. 17, and *Croy* at 715. The task for this Court, therefore, in considering defendant AGG's motion for summary judgment, if *Partridge* is controlling, is to determine whether among the allegations noted above

factual questions remain as to whether AGG's conduct was an extreme departure from the standards of ordinary care which presented a danger of misleading buyers of NAAC notes and this danger was either known to AGG or was so obvious that AGG must have been aware of it.

█ While the Fifth Circuit in *Partridge* has adopted the extreme recklessness standard for actions under Rule 10b–5, it remains unclear whether extreme recklessness constitutes a sufficient degree of culpability to hold an aider and abettor liable under that rule. Even though the Fifth Circuit recognized liability for aiding and abetting another's violation of Rule 10b–5 in *Woodward v. Metro Bank of Dallas*, 522 F.2d 84, 94–97 (5th Cir. 1975), the court therein suggested that a more remote party must not only be aware of his role, but he should also know when and to what degree he is furthering the fraud. *Id.* at 95. The general requirements for holding an individual liable as an aider and abettor under Rule 10b–5 are: (1) some party must have committed a securities law violation; (2) the accused party must have had a general awareness that his role was part of an overall activity that was improper; and (3) the accused aider and abettor must have knowingly and substantially assisted the violation. 522 F.2d at 95; *Rolf v. Blyth, Eastman Dillon & Co.*, 570 F.2d 38, 47–48 (2d Cir. 1978); *S.E.C. v. National Student Marketing Corp.*, 457 F.Supp. 682, 712–13 (D.D.C.1978). These requirements may not be exhaustive in a case where there is an absence of some special relationship between the alleged aider and abettor and the defendant that is fiduciary in nature. *Woodward* indicated that "the scienter requirement scales upward when activity is more remote," 522 F.2d at 95, and the Second Circuit squarely held in *Edwards & Hanly v. Wells Fargo Securities Clearance Corp.*, 602 F.2d 478 (2d Cir. 1979), that to find an individual liable for aiding and abetting a violation of 10b–5 requires something closer to an actual intent to aid in a

**9.** The rehearing en banc was granted at 618 F.2d 396 (5th Cir. 1980).

fraud in the absence of a fiduciary duty. *Id.* at 485. The Fifth Circuit in *Partridge* failed to address the distinction between a principal violator of 10b–5 and an aider and abettor of such a violation.

It has been held that where the aider and abettor has reason to foresee that his actions, misrepresentations, or omissions will be relied upon by third parties recklessness is sufficient to establish scienter. The court in *Oleck v. Fisher* [1979 Transfer Binder] Fed.Sec.L.Rep. (CCH) ¶ 96,898 (S.D.N.Y. 1979) so held where an accountant had reason to foresee that his audit or opinion letter would be relied upon by purchasers. The same analysis and conclusion is found in *Sharp v. Coopers & Lybrand*, 457 F.Supp. 879 (E.D.Pa.1978) where the court opines:

> [O]nce there is a breach of a duty extending to persons beyond those in privity with an accountant, i. e., once there is fraud and not mere failure to exercise reasonable care,
>
> > "If the certified financial statements [or opinions] are intended to be used and are used, to the knowledge of the accountants, in the sale of securities by the company or someone else to the public, there would seem to be little question that the purchasers are persons entitled to complain of that breach of duty even under Cardozo's opinion in the *Ultramares [Ultramares v. Touche, Niven & Co.*, 255 N.Y. 170, 174 N.E. 441] case which is discussed in *Ernst & Ernst.*"
>
> R. Jennings & H. Marsh, Securities Regulations: Cases and Materials 1132 (1977).

457 F.Supp. at 888.

Finding the rationale of these cases persuasive, the Court holds that knowledge by AGG of third party reliance on the advertisements which it commented upon and knowledge by AGG that due to its advice purchasers of Thrift Notes would receive no prospectus disclosing risks related to their purchases would impose on AGG a duty to the buying public not to violate Rule 10b–5. Consequently, the extreme recklessness standard of *Partridge* applies to this case since the exception in *Woodward* with respect to remote parties does not.

*Plaintiff's Rule 10b–5 Allegations.* Plaintiff's first allegation under Rule 10b–5 is that AGG issued opinions that NAAC Thrift and Term Notes were exempt from the registration provisions of the Securities Act and that the Thrift Notes were exempt from the registration provisions of the Georgia Securities Act, when it knew or should have known that those notes were not so exempt. The plaintiffs contend the facts to be as follows. AGG's initial opinion letter on the availability of the intrastate exemption of section 3(a)(11) of the Securities Act for NAAC Term Notes was issued to FNB, the proposed indenture trustee, in August 1971. The opinion contained no supporting legal rationale or factual data whatever. AGG allegedly performed no rigorous analysis of NAAC's business at that time to determine whether NAAC was in fact an intrastate operation. The next opinion letter was issued in December 1972. The opinion was encompassed in one paragraph and stated: "we do not believe that the transactions outlined in the Touche Ross & Co. letter would themselves constitute any change in the availability or lack of availability of such exemption." The Touche Ross letter referred to was one by a Touche Ross auditor to NAAC's president seeking an opinion from NAAC's lawyers as to whether the upstreaming of $27,000,000 from NAAC to its new parent, O–A, had so changed NAAC's financial stability as to make it necessary to make an offer of rescission to Term Note purchasers. It was in its negative response to that specific question that NAAC reiterated its position on the availability of the intrastate exemption.

In January 1973, Touche Ross requested a thorough opinion letter concerning the exemption. Plaintiffs allege that in response to this request AGG sought out law and facts to sustain their two previous letters' conclusions in such a way as to preclude an objective determination with respect to the availability of the exemption. The result was the AGG lawyers settled on using an "operating-income" test which allowed the conclusion that NAAC met the "doing busi-

ness" in Georgia requirement found in section 3(a)(11) of the Securities Act. Plaintiffs contend that by looking to sources of NAAC funds, principally NAAC notes sold in Georgia, and not to other factors arguably recognized as legally pertinent, AGG acted with sufficient recklessness or intent to be liable to plaintiffs under Rule 10b–5. Plaintiffs point to the initial facts gathered by NAAC's in-house counsel, Hugh Brock, and later by other AGG attorneys, to show facts which militate against the availability of the exemption and which were known to AGG when they allegedly decided to adopt an "operating-income" test. These include the following: Seventy-four percent (74%) of NAAC's assets were outside Georgia; Nineteen (19) of NAAC's twenty-six offices were out-of-state; three of NAAC's four directors were out-of-state; NAAC made 51.6% of its direct loans out-of-state, and of home improvement loans 76.5% were made outside Georgia; all land loans were out-of-state; of all paper owned by NAAC, only 7.8% related to Georgia property; of all operating assets, only 10.4% were in Georgia. Alleging that AGG's principal NAAC attorney found the above facts unacceptable since they would indicate a failure to meet the "doing business" requirement noted above, plaintiffs contend that the attorney created the "operating income" criteria and decided that income derived from out-of-state receivables purchased in bulk was Georgia income. Plaintiffs argue that decision allowed AGG to discount the fact that 76% of NAAC's assets were located outside Georgia and that its principal customer for receivables was SMI, a New York real estate investment trust. The "operating income" test likewise excluded from consideration the $27,000,000 of NAAC cash which was upstreamed to O–A, which was a Delaware corporation headquartered in Texas.

In considering defendant AGG's motion for summary judgment with respect to plaintiffs' Rule 10b–5 claims grounded in the above-discussed opinion letters the Court, guided by the standard of reasonableness, must view the evidence, and draw all permissible inferences from that evidence, most favorable to plaintiffs. *Pharo*

*v. Smith*, 621 F.2d 656, 664 (5th Cir. 1980); *Keiser v. Coliseum Properties, Inc.*, 614 F.2d 406 (5th Cir. 1980). In order to determine whether the plaintiffs could never be entitled to recovery under the factual scheme they have presented and thus whether defendant's motion should be granted, the court must examine the legal sufficiency of AGG's "operating income" test.

Defendant AGG argues that as of January 1973, only three cases addressing the doing business requirement of the intrastate exemption had been reported. These were *S.E.C. v. Truckee Showboat, Inc.*, 157 F.Supp. 824 (S.D.Cal.1957); *Chapman v. Dunn*, 414 F.2d 153 (6th Cir. 1969); and *S.E.C. v. McDonald Investment Co.*, 343 F.Supp. 343 (D.Minn.1972). In addition, the SEC had issued a number of releases concerning the intrastate exemption, of which only the last two, Securities Act Release Nos. 4434 and 5349, 26 Fed.Reg. 11896 (Dec. 6, 1961) and 38 Fed.Reg. 2468 (Jan. 8, 1973), respectively, were relevant to the "doing business" requirement of the intrastate exemption.

The issuer in *Truckee Showboat* was a California corporation that kept its books and records in California, which likewise was the state of residence of all of the corporate officers and directors. The corporation made an offer to sell stock solely to California residents through an advertisement placed in the Los Angeles Times. The proceeds of the sales of securities were to be used to acquire, refurbish and operate the El Cortez Hotel in Las Vegas, Nevada. In a short conclusion of law containing no analysis whatsoever the court held that under these facts the intrastate exemption was not available to the issuer. 157 F.Supp. at 825. The determinative factor in this decision *must* have been the proposed out-of-state use of proceeds, as that factor was the only one not involving the state of California.

The next word on the meaning of section 3(a)(11)'s "doing business" requirement came in 1961 in S.E.C. Release No. 4434. That release stated that the intrastate exemption was designed to apply only to local

financing that may practically be consummated in its entirety within the state in which the issuer is both incorporated and doing business. The doing business requirement, the release stated, is satisfied by the performance of substantial operational activities in the state of incorporation, but is *not* met by functions such as bookkeeping, stock record and similar activities or by offering securities in the state.[10]

*Chapman*, decided in 1969, concluded that an issuer who maintained an office and staff in its state of incorporation but offered and sold fractional undivided interests in oil and gas leases on income producing property located outside the state failed to meet the "doing business" requirement since an issuer must conduct a predominant amount of his business within the state of incorporation. 414 F.2d at 159. The crux of the court's holding was that the business which the issuer must conduct within the state of incorporation refers to the income producing operations of the business in which the issuer is selling the securities. *Id.*

In addition to *Truckee Showboat*, Release No. 4434, and *Chapman*, AGG argues that it relied on *S.E.C. v. McDonald Investment Co.*, 343 F.Supp. 343 (D.Minn.1972), in preparing its opinion letters. In *McDonald Investment*, the issuer, a Minnesota corporation, sold general unsecured debt obligations consisting of installment promissory notes, the proceeds from the sale of which were to be used principally, if not entirely, to make loans to land developers outside of Minnesota. The court found that the issuance did not meet the doing business requirement of section 3(a)(11) because of the out-of-state use of proceeds of the note sales.

Finally, S.E.C. Release No. 5349, issued in January 1973, proposed the adoption of Rule 147, under which the principal office

of the issuer was acquired to be within the state of incorporation and 90% of the proceeds from the intrastate offering were required to be used within the state of incorporation.[11] In addition, Proposed Rule 147 provided that the "doing business" test would be met when at least 80% of the issuer's gross revenues and those of its subsidiaries on a consolidated basis were derived from the operation of a business or property located in or rendering services within the state; and it was to be required under the proposed rule that at least 80% of the issuer's assets be located within such state.

The legal tests extant at the time AGG drew its January 1973 opinion letter as evidenced in the above cases and S.E.C. Releases on which AGG relied provided four tests by which a court could measure an issuer's reliance on section 3(a)(11). These included (1) use of proceeds; (2) a mixture of (a) center of operational activities; (b) conduct of a predominant amount of business; and (c) operations producing income; (3) source of gross revenues; and (4) location of issuer's assets. While AGG argues the tests should be labeled (1) operational activities; (2) operating assets; (3) use of proceeds; and (4) operating income tests, the Court finds better labels to be as first listed above if support is to be found in the cases and S.E.C. Releases for these tests. AGG argues that as a matter of law its determination that NAAC was entitled to the intrastate exemption on the basis of its application of the facts surrounding NAAC's business to the tests listed above was neither reckless nor intentional and therefore cannot lead to any liability under Rule 10b–5. Because of the alleged facts noted above, among them that over 70% of NAAC's assets were outside Georgia, that a large percentage of NAAC's loans were made out-of-state, and that AGG excluded consideration of both the $27,000,000 NAAC

---

**10.** The release clearly found functions such as "bookkeeping, stock record and similar activities" fail to meet the substantial operational activities test. Defendant AGG, in its brief in support of its motion for summary judgment, however cited these activities as examples of

the performance of substantial operational activities. AGG's Brief at 18.

**11.** The 90% figure was dropped to 80% when Rule 147 was adopted in S.E.C. Release No. 5450, on January 7, 1974.

loaned to O–A and SMI's purchases of receivables held by NAAC, the Court is unable to conclude as a matter of law on this record that AGG's opinion letters were not recklessly or intentionally erroneously rendered as a matter of law; neither is the Court able to conclude as a matter of law on the present record that AGG did not construct its legal tests to accommodate the facts it deemed material. Either could have misled and defrauded plaintiff purchasers if they would not have made their purchases following a full disclosure of NAAC's finances as would have occurred under the federal registration. Accordingly, defendant AGG's motion for summary judgment based on the opinion letters it rendered is DENIED.

The second factual averment on which plaintiffs rely and which has evoked a motion for summary judgment under Rule 10b–5 by defendant AGG is that AGG "participated in the preparation and promulgation of the advertising used in connection with the sale of the Thrift Notes and Term Notes", including "approval, disapproval, and direction as to the content of said advertising when it knew or should have known" the advertising was misleading, fraudulent, and deceitful. While the allegations above could be found to allege both primary and secondary violations of Rule 10b–5, plaintiffs, in their brief in opposition to defendant AGG's motion, have confined their argument to one which places AGG in a role as aider and abettor with respect to their assistance to NAAC's advertising efforts.

Plaintiffs allege that the specific activities of AGG on which AGG may be held liable as an aider and abettor occurred in May 1973 when it was called upon to render advice as to the adequacy of proposed note advertising. At that time Ken Killmaster, NAAC's vice president in charge of note sales, sent several pieces of proposed NAAC advertising, including television scripts, Thrift Note brochures, and form letters soliciting note purchases to AGG's principal NAAC attorney and requested the attorney's comments.

While the record is unclear as to which television and newspaper ads were the subject of the attorney's response, it is clear which brochure he responded to. The brochure was the only supplementary information given to an inquiring Thrift Note purchaser. Plaintiffs find the attorney's comments lacking in their failure to avoid alleged material non-disclosures. These included his alleged failure to show concern over the lack of advice Thrift Note purchasers received that NAAC's land companies were a huge cash drain; that the reason NAAC's lines of bank credit had dried up was the bankers' reaction to O–A's upstreaming of $27,000,000 in NAAC assets; that due to the lack of credit and the loss of SMI as a customer for NAAC's receivables NAAC was heavily dependent on the sale of Thrift Notes to redeem Thrift Notes; and that proposed Rule 147 presented a threat to NAAC's ability to continue note sales. Plaintiffs allege that under these facts AGG's approval of advertising which was misleading due to omissions constituted the aiding and abetting of NAAC's underlying fraudulent misrepresentations.

Defendant's response to these allegations contests plaintiffs' claim that a Rule 147 problem existed in May 1973 and plaintiffs' general assertion that Thrift Note Purchasers needed the same information received by Term Note purchasers through the Term Note prospectus. The Rule 147 response is based on the fact that as of May 1973 it was not inevitable that Rule 147 would ever become effective. The response with respect to the need for information rests on defendants' belief that because Thrift Notes were redeemable at will the purchaser thereof did not need information such as that omitted because that information concerned only NAAC's long term performance. Finally, defendant argues that AGG's alleged failure to supply the information concerning NAAC's long term performance to purchasers of Thrift Notes cannot support the imposition of aiding and abetting liability under the federal securities laws.

While the Court may agree with defendant concerning the importance of Rule 147 in May 1973, it cannot agree as a matter of law that the purchaser of a security which is redeemable at will need not be supplied with long term information concerning the financial health of the issuer simply because the security is redeemable at will. The federal securities acts were designed to provide investors with full disclosure of material information concerning public offerings of securities in commerce, to protect investors against fraud, and to promote ethical standards of honesty and fair dealing. *Ernst & Ernst v. Hochfelder*, 425 U.S. at 195, 96 S.Ct. at 1382. The acts attempt to provide for the unrestricted flow of information and funds, and in order to accomplish that purpose the statutory scheme places disclosure requirements on those with access to relevant information. *Croy v. Campbell*, 624 F.2d at 712. By hindsight, need for more information by Thrift Note purchasers appears clear since holders of notes redeemable at will were unable to redeem them in February 1974 due to NAAC's bankruptcy. In addition, the Court must disagree with defendant AGG that omissions from NAAC's advertising following review by AGG cannot, as a matter of law, support the imposition of aiding and abetting liability under Rule 10b–5. AGG has asserted that even if the nondisclosures cited herein are a violation of 10b–5, under the rule of *Woodward* such nondisclosures do not satisfy the scienter requirement for aiding and abetting liability as a matter of law. On the basis of plaintiff's allegations that the above facts infer AGG's omissions to have been the result of its intentional failure to advise disclosure and defendant's assertion in response that its advice was merely ordinary activity which lawyers have engaged in from time immemorial, the Court simply cannot determine as a matter of law at this time whether or not AGG's omissions were due to a reckless or an intentional disregard for the information needed by Thrift Note purchasers to make an informed decision to purchase NAAC notes as required for the imposition of liability. Consequently, summary judgment with respect to AGG's advice concerning NAAC's advertisements is DENIED.

The Court next turns to plaintiffs' third factual scenario which allegedly creates 10b–5 liability. Plaintiffs allege that AGG "participated and assisted in the preparation of and permitted the use of materially misleading and false prospectuses and other written literature" in connection with the sale of Thrift Notes and Term Notes, when it knew or should have known such literature was misleading, fraudulent, and deceitful.

NAAC issued three prospectuses relating to its Term Note sales in July 1971, August 1972, and February 1973. The 1973 prospectus related to a new $5,000,000 issuance which aborted after approximately $880,000 worth of notes were sold. These prospectuses applied only to Term Notes which were registered with the Georgia Securities Commission and never applied to Thrift Notes. The only allegations plaintiffs make in their brief in response to defendant's motion concerning this portion of their complaint concerns the failure of NAAC to distribute these prospectuses to purchasers of NAAC Thrift Notes. Defendant's brief argues persuasively that this portion of plaintiff's complaint is merely a reiteration of their allegations with respect to AGG's assistance to NAAC in the preparation of its intrastate exemption opinion letters and advertising. For that reason the Court finds no need to consider further this redundant claim nor defendant's redundant motion with respect thereto at this point or at any later point in the litigation of this matter.[12]

12. The failure of NAAC to provide material information to Thrift Note purchasers would be a violation of Rule 10b–5 and should plaintiffs prove the requisite involvement and scienter to establish aider and abettor liability at trial on the part of any secondary actor, that evidence may be admitted. The Court does not infer otherwise in finding plaintiffs' third factual allegation encompassed within the first two such allegations.

Finally, the Court turns to plaintiff's fourth and final ground for establishing 10b–5 liability. Plaintiffs have alleged that AGG "prepared and approved a trust indenture" agreement between NAAC and First National without having it qualified under the Trust Indenture Act, when it knew or should have known that the indenture agreement was required to be so qualified. Defendant's answer to this allegation is that the trust indenture agreements between NAAC and FNB were not required to be qualified because under the Trust Indenture Act the securities to be sold under the indenture agreements were exempt from registration under the intrastate exemption. Further, defendant argues that plaintiffs have not shown that the instant agreements lacked any disclosures that a qualified trust indenture would have had. Because the plaintiffs have failed to respond to defendant's motion with respect to Rule 10b–5 liability under the Trust Indenture Act said motion is hereby GRANTED.

Before the Court concludes its analysis of defendant AGG's motion for summary judgment it must be noted that a substantial portion of plaintiffs' brief relates to possible 10b–5 liability as a result of AGG's advice to NAAC in January 1974, during NAAC's final solvent days. As noted by defendant in response to plaintiffs' brief, these allegations appear neither in the original complaint nor in any amendments thereto. While the defendant argues that these allegations present no issues of material fact as to what AGG did and advised in January 1974, the Court cannot agree in light of the legal standard announced herein. While the Court refuses to make a determinative ruling with regard to factual allegations which do not even comprise a portion of plaintiff's complaint, it will note that it finds questions of fact remaining as to AGG's January 1974 activities.

*Statute of Limitations.* Having dismissed all claims against AGG except those arising under Rule 10b–5 the Court's task in deciding defendant AGG's motion to dismiss under the statute of limitations is made simple.

AGG argues that the Rule 10b–5 claims against AGG of class members who purchased prior to February 1, 1973, more than two years before the date on which AGG agreed to toll the statute of limitations, are time barred.[13] AGG relies on several cases which have held Georgia's two-year blue sky statute of limitations as found in Ga.Code Ann. § 97–114(c) (1973) to be applicable. Plaintiffs point to *McNeal v. Paine, Webber, Jackson & Curtis, Inc.,* 598 F.2d 888 (5th Cir. 1979) as contrary authority which this Court finds controlling in this case. In *McNeal* the court held that where a purchaser seeks damages against a party other than the seller of the security the sale of which gave rise to a federal securities claim the Georgia statute *most* resembling the 10b–5 cause of action is the Georgia general fraud statute as found in Ga.Code Ann. §§ 105–301, 304 (1968), the statute of limitations for which is four years. 598 F.2d at 893–94 & n. 10. The Court, holds that purchasers of NAAC notes subsequent to February 1, 1971, are not time barred from bringing an action against AGG under Rule 10b–5.

The Court cannot at this time foreclose any plaintiffs from proceeding to trial based on a statute of limitations defense here, however, because the doctrine of equitable tolling applies. That doctrine permits, with respect to fraud, the tolling of the limitations period until plaintiff discovers, or should have discovered through the exercise of due diligence, the fraudulent activity. 598 F.2d at 893 n. 11. The test for determining when the period begins to run is an objective one, depending upon when the plaintiff should have discovered the alleged violation in the exercise of reasonable diligence, and not a subjective one, depending merely on when the plaintiff actually discovered the violation. *Id.* Thus while some plaintiffs who purchased notes

---

**13.** *See* note 5 *supra* for an explanation of AGG's agreement to toll the statute of limitations beginning February 1, 1975.

prior to February 1, 1971 *may* be foreclosed, no facts are before the Court at present which would merit a ruling in defendant AGG's favor at this juncture. Consequently, defendant's statute of limitations motion is DENIED.

## TOUCHE ROSS & CO.

Defendant Touche Ross has moved for summary judgment on the following five grounds:

(1) Plaintiffs' claims under Section 12(1) of the Securities Act of 1933, 15 U.S.C. § 77*l* (1), are subject to summary judgment since Touche Ross was not a "seller" of NAAC securities: Touche Ross did not offer, or sell, or participate in the offer or sale of NAAC notes.

(2) Plaintiffs' claims under Section 12(2) of the Securities Act of 1933, 15 U.S.C. § 77*l* (2), are subject to summary judgment because Touche Ross was not a "seller" of NAAC securities: Touche Ross did not offer, or sell, or participate in the offer or sale of NAAC notes.

(3) Plaintiffs' claims under Section 17(a) of the Securities Act of 1933, 15 U.S.C. § 77q, are subject to summary judgment because there is no implied private right of action under that statutory provision.

(4) Plaintiffs' claims under Section 10(b) and Rule 10b–5 of the 1934 Securities Exchange Act, 15 U.S.C. § 78j(b), 17 C.F.R. 240.10b–5, are subject to summary judgment as Plaintiffs have raised no genuine issue of material fact that Touche Ross acted with scienter or that Touche Ross offered knowing substantial assistance to NAAC in the achievement of the alleged violations.

(5) Plaintiffs' claims under Section 11 and 13 of the Georgia Securities Act, 1957 Georgia Laws 134 at 159, 161, are subject to summary judgment because Touche Ross was not NAAC's "agent"; the Act offers no remedy against one who is not a principal in the sale of securities; and Plaintiffs have failed to raise a genuine issue of material fact that Touche Ross acted with scienter.

Plaintiffs' brief in response to Touche Ross' motion responds solely to defendant's motion with respect to section 10(b) of the Exchange Act and Rule 10b–5 promulgated thereunder. Plaintiffs' opposition to defendant's motion under sections 12 and 17 of the Securities Act and under the Georgia Securities Act is found in Plaintiffs' Brief in Response to Supplementary Motions of Arnall, Golden & Gregory and Touche Ross & Co.

■■■ As the Court has noted above the latest test for determining who can be held liable as a seller under section 12 of the Securities Act is found in *Croy v. Campbell*, 624 F.2d 709 (5th Cir. 1980). Since the court in *Croy* could not find that the defendant's participation in the transaction in question proximately caused the plaintiff's injury or that the plaintiffs would not have purchased the security "but for" his actions, it held that he was not a seller under section 12. *Id.* at 714. With respect to Touche Ross plaintiffs have written two paragraphs in opposition to defendant's motion under section 12 contending that the record before the Court presents a jury question as to whether or not Touche Ross' participation in NAAC's affairs during 1973 was a substantial contributing factor in causing the sale of NAAC notes to plaintiffs. Plaintiffs in effect argue that they would not have purchased their notes had Touche Ross not issued materially misleading reports and had the accountants not refused to correct others which it knew had become misleading. Nothing in the record is cited to substantiate these claims of causation.

In addition, plaintiffs have stated in a footnote to their brief in response to defendant's motion for summary judgment that "Touche's connection with NAAC's non-registration of Thrift Notes is too tenuous to support liability" under Count I of the complaint which alleges violations of section 12(1) of the Securities Act. This statement seems to indicate that despite their brief in opposition to defendant's motion under section 12, plaintiffs are discon-

tinuing that claim.[14] Whether or not the plaintiffs have abandoned their section 12 claims is immaterial in light of the response they made to defendant's argument based on *Croy*. That response, citing nothing in the record to substantiate plaintiffs' claims that Touche Ross was a section 12 seller, fails to set forth specific facts by affidavits or otherwise, as required by Fed.R.Civ.P. 56(e), in order to withstand defendant's motion. Accordingly, defendant Touche Ross' motion for summary judgment based on grounds one (1) and two (2) above is GRANTED.

With respect to plaintiffs' claim under section 17 of the Securities Act, the Court notes, as it did above in considering AGG's motions, that this court has found that no implied private cause of action arises thereunder. *Gunter v. Hutcheson*, 433 F.Supp. 42 (N.D.Ga.1977). Consequently, defendant's motion based on ground three (3) above is GRANTED.

The Court next considers defendant's motion to dismiss plaintiffs' claims under the Georgia Securities Act of 1957 which the Court above held inapplicable to AGG because it could not be shown that AGG acted as NAAC's agent for the sale of NAAC notes.

Plaintiffs have argued in response to defendant's motion that because Touche Ross substantially assisted the perpetration of NAAC's fraud by allegedly failing to reveal material facts in their misleading audit reports and refusing for ten (10) months to issue a going concern disclaimer as to the fairness of NAAC's financial statements, Touche Ross was NAAC's agent under section 13 of the Georgia Act. As the Court held above in considering AGG's motion, the question now before the Court is whether a genuine issue as to a material fact exists with respect to the question of whether defendant Touche Ross was an agent of NAAC who participated or aided

in any way in making sales of NAAC notes. Construing the facts most favorably for the plaintiffs, the Court cannot conclude that the above allegations by plaintiffs have created the relation whereby NAAC authorized Touche Ross to participate or aid in any way in making sales of NAAC notes. Neither do the above allegations demonstrate that NAAC has after-the-fact ratified Touche Ross' participation or aid in making sales of NAAC notes, an action which would also have created an agency relationship under section 13. Again, as noted above, to find an individual or an accountant to be an *agent* who has participated or aided in *making sales* of securities, the Court must find that the individual was so entangled in the actual sale of the security that his activities were at least a substantial factor in the purchaser's decision to buy the security and that his activities were either authorized by or ratified by the issuer. The activities of Touche Ross alleged above certainly do not meet that level of participation; therefore, the Court GRANTS defendant Touche Ross' motion for judgment on the pleadings and summary judgment with respect to plaintiffs' claims against Touche Ross under the Georgia Securities Act of 1957.

*Section 10(b) and Rule 10b–5.* Plaintiffs allege that during the entire period from late 1972 through early 1974, Touche Ross knew that NAAC was selling millions of dollars of notes every month and that the only information which was generally available to the public about NAAC's finances was a totally misleading prospectus issued in August 1972. Plaintiffs allege that a number of activities to be reviewed below indicate that Touche Ross substantially assisted the perpetration of the alleged fraud. Such an allegation that Touche Ross was an aider and abettor of NAAC's requires the Court to measure Touche Ross's activities against the same standard of liability as that discussed in connection with AGG. Thus, for Touche Ross to be liable to plain-

**14.** Sections 12(1) and 12(2) both require a defendant to be a "seller" as defined in *Croy v. Campbell*, 624 F.2d 709 (5th Cir. 1980), before liability can attach. If plaintiffs believe their relationship with Touche Ross too tenuous to support liability under section 12(1), their relationship was also too tenuous to support liability under action 12(2) which is the basis of Count II of the complaint.

tiffs under any set of facts the following must have been present: (1) NAAC must have committed a securities law violation; (2) Touche Ross must have had a general awareness that its role was part of an over-all activity that was improper; and (3) Touche Ross must have knowingly and sub-stantially assisted the violation. Assuming that NAAC committed a securities law vio-lation, the question for the Court in con-sidering defendant's motion for summary judgment is whether genuine issues of ma-terial fact continue to exist concerning whether Touche Ross' conduct was an ex-treme departure from the standards of ordi-nary care which presented a danger of mis-leading buyers of NAAC notes and this danger was either known to Touche Ross or was so obvious that Touche Ross must have been aware of it. If the undisputed facts show that Touche Ross merely made judg-mental errors not rising above the level of negligence there can be no liability. *Oleck v. Fischer*, 623 F.2d 791 (2d Cir. 1980).

*Plaintiffs' allegations.* Plaintiffs allege the following: The August 1972 prospectus on which the buying public relied from that date until 1974 contained financial state-ments which were misleadingly optimistic and later had to be restated; moreover, significant events occurred after their is-suance which aggravated the situation. Plaintiffs claim the August 1972 prospectus did not disclose any of the following events to the investing public: that in late 1972 NAAC began losing enormous sums of mon-ey; that it faced the prospect of having to fund its land subsidiaries with tens of mil-lions of dollars; that it faced impossible cash demands elsewhere; that it had virtu-ally no cash or cash resources with which to cover those demands or its more than $30 million in demand or short-term debt; that substantial financial resources which it had earlier possessed (and which were described in detail in the prospectus and other sales material) had been suddenly sent upstream to its parent, O–A, or pledged to its former subsidiary, SMI; that it had little credit; that it was under investigation by the SEC; that it had to rely almost solely upon the proceeds of current note sales in order to

pay off notes coming due; and that it was facing the prospect of having its further note sales become impossible because of a newly-proposed SEC regulation. From late 1972 on, Touche Ross allegedly knew, al-though the Georgia public did not, that all of the above factors created a strong likeli-hood that, at some time in the relatively near future, NAAC would be unable to redeem the notes it was continuing to sell.

The latest financial statement in the Au-gust prospectus was dated May 31, 1972. NAAC's fiscal year ended on June 30. Touche prepared a year-end financial report which alluded to some of the facts referred to above. Touche knew that this report—like others it issued later on NAAC's finan-cial statements for periods after those con-tained in the August, 1972 prospectus—was required by law and contract to be distrib-uted to Term Note purchasers. Pursuant to the terms of NAAC's Term Note Indenture, NAAC was required to file copies of its audited financial statements with the note-holders' trustee annually within 120 days after May 31, and to mail copies to the noteholders themselves within 30 days thereafter. NAAC allegedly did not do so, and Touche knew it. Pursuant to a current SEC release interpreting the federal securi-ties laws, as to which Touche also had actu-al knowledge, risk factors with respect to sales of notes like NAAC's (which in NAAC's case certainly included current fi-nancial information) were required to be made available to note purchasers. They allegedly were not, and Touche knew it.

During early 1973, Touche twice reissued and restated its reports on NAAC's finan-cial statements for the fiscal year ended June 30, 1972. On the second occasion, the restatement was required by the American Institute of Certified Public Accountants and virtually wiped out NAAC's long histo-ry of reported profits which had been prom-inently displayed in the August 1972 pro-spectus. Touche allegedly strained itself on both occasions to generate audit reports which were misleadingly bland in the face of overpowering negative facts. Plain-tiffs contend these reports failed to comply

with generally accepted auditing standards, primarily because they failed to give sufficient consideration to material facts as to NAAC's operating and financial problems postdating the end of the fiscal year and known to Touche. Knowledge of these material facts—as evidenced by memoranda in Touche's own workpapers in March, 1973—should have resulted in Touche issuing a "going concern" disclaimer of opinion on NAAC's restated 1972 financial statements no later than March, 1973. Not only did Touche fail to issue the disclaimer, it allegedly made no effort to see that these reports, which at least partially corrected the statement in the August, 1972 prospectus, were distributed to investors. In short, plaintiffs contend Touche did not ask its client to correct the erroneous impression of financial health which was being perpetuated daily by NAAC in the media and to which Touche's own earlier uncorrected reports lent credence.

Similarly, when, in the summer of 1973 it became obvious to Touche that it had no choice but to issue a "going concern" disclaimer of opinion on NAAC's financial statements for the year ended June 30, 1973, it allegedly delayed issuance of its report for six months until January 21, 1974. As Touche had every reason to suspect, the eventual dissemination of this report caused a run on NAAC notes, which in turn forced NAAC's immediate petition in bankruptcy.

As with its failure in early 1973 to qualify its opinions on NAAC's 1972 financial statements with a "going concern" disclaimer, Touche's inordinate delay in issuing a report on the 1973 financials was occasioned by its unwillingness to administer what it allegedly knew would, in effect, be the "coup de grace" to its client. In refusing to make public for ten months before January 21, 1974, its "going concern" disclaimer on NAAC's financial statements, plaintiffs contend Touche knowingly disregarded its obligations as an independent professional and the consequences of NAAC's ongoing fraud on members of the Georgia public, who in the ten months before NAAC's bankruptcy were purchasing its notes at an average rate of over $200,000 a day.

*Touche Ross' Response.* In response to the above allegations Touche Ross makes the following three arguments: (1) Touche Ross had no duty to update or change its report contained in NAAC's August 1972 prospectus because of a change in accounting principles that occurred in January 1973; (2) Touche Ross' determination that a "going-concern" qualification was not required with respect to NAAC's June 30, 1972, financial statements and did not violate Rule 10b–5; and (3) Touche Ross had no legal duty to make disclosures regarding the financial condition of NAAC prior to completing its audit and releasing its audit report on NAAC's June 30, 1973, financial statements. These responses will be considered *seriatim.*

Plaintiffs' initial argument under Rule 10b–5 as outlined above is that Touche Ross is liable because it failed to correct its audit report contained in NAAC's August 1972 prospectus. Plaintiffs contend that a correction was required to reflect a change in accounting principles that occurred in January 1973, concerning the proper method of accounting for retail land sales. The record shows, however, that at least by January 23, 1973, if not before, the 1972 Term Note offering for which the August 1972 prospectus was prepared, had terminated and all sales pursuant to the 1972 prospectus had ceased. Defendant argues, therefore, that Touche Ross' audit report was correct when issued and no event that occurred subsequent to August 1972 imposed any legal or professional duty on Touche Ross to change its report.

Defendant Touche Ross issued two reports in 1973 after the new American Institute of Certified Public Accountants (AICPA) Guide was promulgated which disclosed the existence and effect of the new Guide. In the first report, contained in NAAC's February 1973 prospectus, Touche stated its opinion under the new Guide that, because NAAC expected a material reduction in land contracts receivable, stockholders' equity, revenues and net earnings as shown in

the financial statements in the February 1973 prospectus *did not* fairly present the financial position of NAAC at June 30, 1972. The second report was dated March 21, 1973, and the NAAC financials as of June 30, 1972 covered by this report contained the new restatement of earnings for the five previous years based on the new Guide. The facts in the record clearly show that each of the three audit reports discussed above were based upon generally accepted accounting principles in effect at the date the reports were released. Plaintiffs argue that Touche had an affirmative duty to correct the NAAC financial statements for May 31, 1972, which were included in the August 1972 prospectus when it later became apparent that they were misleading at the time of issuance, citing *First Virginia Bankshares v. Benson*, 559 F.2d 1307 (5th Cir. 1977); *United States v. Natelli*, 527 F.2d 311 (2d Cir. 1975), *cert. denied*, 425 U.S. 934, 96 S.Ct. 1663, 48 L.Ed.2d 175 (1976); *Sharp v. Coopers & Lybrand*, 83 F.R.D. 343 (E.D.Pa.1979); and *Fischer v. Kletz*, 266 F.Supp. 180 (S.D.N.Y.1967).

After carefully examining these cases, the Court must agree with defendant that their conclusions are not applicable to the facts of this case. The holding of these cases is that an accountant has a duty to correct certified financial statements to reflect newly discovered facts when that would make a report inaccurate when made. Here, as in *Hirsch v. du Pont*, 553 F.2d 750 (2d Cir. 1977), relied upon by defendant, no new facts were discovered with respect to NAAC's retail land sales subsequent to August 1972. The subsequent event which plaintiffs deem pertinent is the alteration of a method of accounting by the AICPA, not a new fact with respect to NAAC's financial condition in August 1972 not known to Touche Ross at the time of the issuance of the opinion. Consequently, the Court finds plaintiffs' claims against Touche Ross to be most similar to those found in *Hirsch* and in *Ingenito v. Bermec Corp.*, 441 F.Supp. 525 (S.D.N.Y.1977), also

relied upon by defendants, wherein the court held that the mere possession of adverse financial information does not require an independent auditor to disclose it even if the auditor previously has certified figures for a prior period, so long as the certified statement is still accurate *as of the date of its issuance.* 441 F.Supp. 525.

■ Since the facts before the Court as reviewed above conclusively show that the opinion rendered by Touche Ross in the August 1972 prospectus promulgated by NAAC was consistent with generally accepted auditing standards at the time it was issued, the Court can find no legal basis for plaintiffs' 10b–5 action on that ground. Consequently, defendant Touche Ross' motion for summary judgment as to this portion of plaintiffs' complaint is hereby GRANTED.

Touche Ross next argues that its determination that a going concern qualification was not required with respect to NAAC's June 30, 1972, financial statements was not a violation of Rule 10b–5. Plaintiffs allege that Touche, in its April 1973 restatement of NAAC's fiscal 1972 financials, failed to comply with the new AICPA Guide which allegedly required it to examine NAAC's capability to finance its land development operations in the future before permitting past land transactions to be recorded as sales. Plaintiffs allege that had Touche properly followed the guide, Touche would have had no choice but to conclude that NAAC had not demonstrated its ability to provide the land companies with funding and as a consequence Touche would have been required to reverse the land companies' past recognition of land sales revenues, add significantly to their restated losses, and write off large portions of NAAC's land contract receivables. Such a course would allegedly have caused Touche to issue a going concern disclaimer of opinion on NAAC's financial statements no later than April 1973.[15]

15. According to plaintiffs, about the most conspicuous "red flag" that an auditor can wave with respect to a company's financial affairs is

to write a report on the corporate statements expressing reservations as to the company's ability to continue as a going concern. Since

Touche, in response, shows that its partner assigned to the NAAC audit in March 1973, specifically reviewed and considered the going-concern issue as part of Touche Ross' audit work at that time. A memorandum to file prepared by Touche partner R. E. Minnear, dated March 29, 1973, shows that because NAAC had recently decided to dispose of the land development companies, Mr. Minnear did not believe a "going concern" statement needed to be made even though the land companies were a cash drain at that time.

■ Plaintiffs argue that the examination conducted by Touche Ross failed to comply with the requirements of paragraphs 15 and 16 of the new AICPA guide dealing with land sales. Paragraph 15(c) mandates that recognition of a sale should be defined only when, *inter alia,*

> The selling company is clearly capable of providing both land improvements and off-site facilities promised in the contract and of meeting all other representations it has made. Its current and prospective financial capabilities are sufficient to provide reasonable assurance that it will be able to fund or bond the planned improvements in the project when required. That ability may be demonstrated by the company's adequate equity capitalization, or its borrowing or bonding capacity, or a continuing positive cash flow from operations.

Plaintiffs argue that between the issuance of the August 1972 prospectus and the March 21, 1973 restatement of NAAC's condition as of June 30, 1972, NAAC's liquid resources had been so heavily depleted and mortgaged that the land companies could not possibly have satisfied the stringent

criteria of paragraph 15(c) of the AICPA guide. Neither the memorandum of R. E. Minnear, the cold review of Richard Gallagher,[16] nor the deposition testimony of Gallagher gives any indisputable indication that Touche assured itself that NAAC's prospective financial capabilities were sufficient to provide reasonable assurance that it would be able to fund or bond the planned improvements in the land improvements contracted for as required by paragraph 15(c). Had Touche made an in-depth study of whether these criteria were met it may have qualified its March 1973 statement to include a "going concern" disclaimer. The record before the Court does not compel the conclusion that a proper examination was made. The Court therefore cannot conclude as a matter of law that Touche did not act with intentional or extreme reckless disregard for the truth when it stated in March 1973 in Plaintiffs' Exhibit 4 that NAAC's method of accounting for retail land sales was in conformity with generally accepted accounting principles.

Consequently questions of fact remain as to whether Touche Ross fulfilled the requirements of paragraph 15(c) of the AICPA Guide in March 1973 and whether, if not, this failure was due to either intentional or extremely reckless acts; defendant Touche Ross' motion for summary judgment based on the March 1973 representations it made is therefore DENIED.

Finally, defendant argues that it had no legal duty to make disclosures regarding the financial condition of NAAC prior to completing its audit and releasing its audit report on NAAC's June 30, 1973 financial statements and that therefore it should have summary judgment granted for it on this final ground.

---

all normal corporate financials are fundamentally premised on the "going concern" concept, this type of reservation invariably results in either a "disclaimer" of opinion—*i. e.*, a statement that the auditor cannot opine whether or not the financials conform to generally accepted accounting principles—or an "adverse" opinion, to the effect that they do not.

**16.** Touche Ross auditor Richard A. Gallagher of the Philadelphia office performed a cold review of NAAC's financials for the two years and

eighteen months ended June 30, 1972. A cold review is a review by a person independent of the client. Deposition of Gallagher, p. 12. Gallagher summarized his review in an inter-office memorandum to National Accounting & Auditing dated May 1, 1973, in which he concluded that NAAC's restated financial statements were fairly presented in conformity with generally accepted accounting principles. Plaintiff's Exhibit 519.

Plaintiffs contend that Touche's "field work" for its audit of NAAC financial statements for the year ending June 30, 1973, was substantially completed by early September 1973, but that it intentionally withheld its "going concern" statement until 1974. Plaintiffs complain that Touche took this time to discuss and to explain to NAAC the reasons for the disclaimer, to haggle with GCI's accountants with respect to how many millions of dollars of NAAC's equity would have to be written off in connection with NAAC's sale to GCI, and to consult with members of its Eastern Technical Inquiry Center and its national staff in New York. Plaintiffs contend that one reason for the delay was Touche Ross' concern that full disclosure might have caused its client to fire Touche, although the document on which plaintiffs' rely for that assertion, an interoffice memo from Robert Sack to Robert Kay of Touche, Plaintiffs' Exhibit 497, merely states that GCI may refuse to accept Touche's June 30, 1973 report and fire Touche, giving no indication that the possibility of that consequence was a reason for withholding Touche's report.

Besides arguing that Touche, as NAAC's accountant, owed no duty to the plaintiffs to monitor the interim financial disclosures made by NAAC or to insure that complete financial data was continuously provided by NAAC to the public, Touche argues that it waited to release its report for a perfectly legitimate reason. The financial complexities arising out of O–A's sale of NAAC to GCI took months to unravel due primarily to the length of time involved in consummating the sale. The issues were fully considered by Atlanta Touche Ross partners Siegel and Minnear, Ray Perry of the Touche Ross Eastern Regional Technical Inquiry Center and Robert Sack of the Touche Ross National Staff.

Plaintiffs have pointed to nothing in the record to demonstrate that Touche Ross failed diligently to perform its audit work or that it delayed the issuance of its

opinion after reaching its professional judgment. While the Court finds persuasive defendant's argument that it owed no duty to plaintiffs to insure that complete financial data was continuously provided by NAAC to the public, *see Hirsch v. duPont*, 553 F.2d 750 (2d Cir. 1977); *Ingenito v. Bermec Corp.*, 441 F.Supp. 525 (S.D.N.Y. 1977), it seems even clearer that no genuine issue of material fact exists that would preclude the Court from granting defendant Touche Ross' summary judgment motion on this point. The record simply fails to provide a genuine issue of fact to support that Touche Ross either intentionally or recklessly withheld its January 1974 report from plaintiffs at any point after it had developed its professional opinion as to what that report should contain. Accordingly, defendant's motion for summary judgment, based on the rendering of its audit report on NAAC's June 30, 1973 financials, is GRANTED.

*Statute of Limitations.* Because the Court has found only one Rule 10b–5 issue that remains in plaintiffs' suit against defendant Touche Ross, the Court need not consider any of defendant Touche's motion for pretrial summary judgment under the applicable statutes of limitation because it made that motion only with respect to plaintiffs' claims under sections 12(1) and 12(2) of the Securities Act and the Georgia Securities Act, portions of plaintiffs' complaint which were disposed of above.

## FIRST NATIONAL BANK

Plaintiffs' case against FNB and First National Holding Corporation (FNHC) [17] is based essentially on FNB's alleged abandonment and disregard, from late 1972 to early 1974, of its contractual and fiduciary obligations to purchasers of Term Notes of North American Acceptance Corporation (NAAC). Approximately $10,000,000 in face amount of these notes, sold pursuant to a Trust Indenture and Supplement under which FNB acted as the noteholders' trus-

17. FNHC owned all of the capital stock of FNB during the period of time the facts of this lawsuit evolved.

tee, remained outstanding at the time of NAAC's bankruptcy on February 6, 1974.

Plaintiffs allege that FNB failed in its obligation to advise the Noteholders of NAAC's several defaults and that FNB failed to use its powers under the indenture to remedy the defaults. Specifically, plaintiffs contend that FNB breached its contractual and fiduciary duties pursuant to the indenture, giving rise to the following three claims: (1) FNB failed to notify noteholders of events of default as required by the indenture; (2) FNB failed to require NAAC to provide noteholders with the information required by the indenture; and (3) FNB failed to declare the Term Notes due and payable when it knew NAAC had transferred substantially all its assets to its corporate parent, thus drastically affecting its ability to repay its debts. In addition to the above claims found in Count VII of the complaint, the plaintiffs have named FNB as a defendant in all other counts, discussed above, except Count VI, which makes allegations solely against Touche Ross.

*FNB–NAAC Indenture.* Defendant FNB argues that it is entitled to summary judgment on both of plaintiffs' claims under the indenture, these being a breach of fiduciary and contractual duties by FNB. In addition, plaintiffs have filed a motion for partial summary judgment on their claim that FNB breached its contractual and fiduciary duties pursuant to the indenture, reserving the question of the proper measure of damages resulting from such breaches for future determination at trial.

■ Defendant argues that *Broad v. Rockwell International Corp.*, 614 F.2d 418, *rehearing en banc granted*, 618 F.2d 396 (5th Cir. 1980), has foreclosed the possibility that a trustee under an indenture owes a fiduciary duty to noteholders under the Trust Indenture Act, meaning that if such a

duty exists, it exists under state law. While Fifth Circuit Local Rule 17 states that the effect of granting a rehearing en banc is to vacate the previous opinion and judgment of the Fifth Circuit, this Court today nevertheless adopts the reasoning of *Broad* in its determination that the Trust Indenture Act imposes no obligation beyond those contained in the indenture itself. *See* 614 F.2d at 431–32. As did the court in *Broad*, however, this Court finds nothing in the Act which would preclude the imposition of a fiduciary duty on an indenture trustee should such a duty be imposed under state law. *Id.* at 432. The question, therefore, is whether Georgia law allows the imposition of fiduciary duties on indenture trustees.

■ Defendant argues that it cannot be held to owe plaintiffs a fiduciary duty under a trust because no trust ever existed for plaintiffs' benefit. In Georgia the requisites of a valid trust are: a declaration of the trust, property to which the trust pertains, a trustee, beneficiaries, terms of purpose, and a remainder interest. *Lummus Supply Co. v. Fidelity Federal Savings & Loan Ass'n*, 141 Ga.App. 831, 833, 234 S.E.2d 671 (1977). Defendant claims that the contractual indenture between FNB and NAAC could not have created a trust because it lacked a trust res and a remainder interest.

■ Plaintiffs argue that under the indenture they released certain rights to FNB and that these rights were the property, or res, to which the trust pertained. It appears to the Court that the section of the indenture on which the plaintiffs rely for this statement, section 5.04, does not divest the plaintiffs of any rights as holders of NAAC notes to sue NAAC for any payment due under their notes.[18] It also does not

---

**18.** Section 5.04 of the indenture reads as follows:

No holder of any Note shall have any right by virtue or by availing of any provision of this Indenture to institute any action or proceedings at law or in equity or in bankruptcy or otherwise, upon or under or with respect to this Indenture, or for the appointment of a

receiver or trustee, or for any other remedy hereunder, unless such holder previously shall have given to the Trustee written notice of default and of the continuance thereof, as hereinbefore provided, and unless also the holders of not less than 25 per cent in aggregate principal amount of the Notes at the time outstanding shall have made written re-

appear to the Court that section 5.04 deprives plaintiff of any rights except those given to FNB by NAAC under the indenture, which were never rights of the plaintiffs in any event. In reliance on section 5.04 and on plaintiffs' failure to controvert defendant FNB's statement pursuant to Local Rule 91.72 that at no time did FNB receive or hold any funds or property for the benefit of Term Noteholders under or pursuant to the indenture (Defendant's Statement of Material Facts, filed August 1, 1980), the Court must find that no res existed which could have been the res of a trust under which FNB owed plaintiffs a fiduciary duty.[19] Consequently, the Court GRANTS defendant's and thus DENIES plaintiffs' motion for summary judgment with respect to this issue.

Plaintiffs' claims of breach of contractual provisions of the indenture have been reduced by plaintiffs to three basic claims. First, plaintiffs allege that FNB failed to notify noteholders of events of default as required by the indenture. Second, FNB allegedly failed to require or request NAAC to provide noteholders with the information required by the indenture. Third, plaintiffs allege that FNB failed to declare the Term Notes due and payable when it knew NAAC had transferred substantially all its assets to O–A.

Defendant FNB argues, in support of its motion, that FNB did not breach the indenture by not sending notice of defaults by NAAC to Term Noteholders because it was not required to send such notice under the applicable indenture provisions. FNB relies on sections 5.07 and 5.01 in making this argument.

Section 5.07 of the indenture provides:

The Trustee shall give to the Noteholders, in the manner and to the extent provided in subsection (c) of Section 4.04, with respect to reports pursuant to subsection (a) of Section 4.04, notice of each default known to the Trustee, within 90 days after the occurrence thereof, unless such default shall have been cured before the giving of such notice (the term "default" or "defaults" for the purpose of this Section 5.07 being hereby defined to be any event or events, as the case may be, specified in clauses (a), (b), (c), (d), (e) and (f) of Section 5.01, not including periods of grace, if any, provided for therein); provided that except in the case of default in the payment of the principal or

quest upon the Trustee to institute such action or proceedings in its own name as Trustee hereunder and shall have offered to the Trustee such reasonable indemnity as it may require against the costs, expenses and liabilities to be incurred therein or thereby, and the Trustee for 60 days after its receipt of such notice, request and offer of indemnity shall have failed to institute any such action or proceedings and no direction inconsistent with such written request shall have been given to the Trustee pursuant to Section 5.06; it being understood and intended, and being expressly covenanted by the taker and holder of every Note with every other taker and holder and the Trustee, that no one or more holders of Notes shall have any right in any manner whatever by virtue or by availing of any provision of this Indenture to affect, disturb or prejudice the rights of any other holder of Notes, or to obtain or seek to obtain priority over or preference to any other such holder or to enforce any right under this Indenture, except in the manner herein provided and for the equal, ratable and common benefit of all holders of Notes. For the protection and enforcement of the provisions of this Section 5.04, each and every Noteholder and the Trustee shall be entitled to such relief as can be given either at law or in equity.

Notwithstanding any other provisions of this Indenture, however, the right of any holder of any Note to receive payment of the principal of, and any interest on such Note, on or after the respective due dates expressed in such Note, or to institute suit for the enforcement of any such payment on or after such respective dates, shall not be impaired or affected without the consent of such holder.

**19.** The indenture agreement between FNB and NAAC is unlike the indenture agreement found in *Atlanta Trust Co. v. National Bondholders Corp.*, 188 Ga. 761, 4 S.E.2d 644 (1939). There the Court found a trust to exist where the mortgage company which issued bonds transferred to the trust company certain notes, bonds, mortgages, deeds of trust and other collateral which the trustee under the indenture held for the common benefit of the bondholders. Abuses in the administration of such trusts led to the enactment of the Trust Indenture Act of 1939. *See* D. Vagts, Basic Corporation Law 631–32 (1973).

interest on any of the Notes, the Trustee shall be protected in withholding such notice if and so long as the board of directors, the executive committee, or a trust committee of the directors or responsible officers or both of the Trustee in good faith determine that the withholding of such notice is in the interest of the Noteholders.

As noted therein, default under section 5.07 is defined to be any "event of default" as defined in section 5.01. Plaintiffs rely on section 5.01(c):

In case one or more of the following Events of Default shall have occurred and be continuing, that is to say: failure on the part of the Company duly to observe or perform any other of the covenants or agreements on the part of the Company contained in the Notes or in this Indenture for a period of thirty days after the date on which written notice of such failure, requiring the Company to remedy the same, shall have been given to the Company by the Trustee, or to the Company and the Trustee by the holders of at least 25 percent in the aggregate principal amount of the Notes at the time outstanding.

Defendant argues that under the express terms of section 5.01(c), NAAC's failure to perform any of its covenants could not constitute an Event of Default unless NAAC failed to cure its non-performance within thirty days after receiving written notice from FNB of its initial failure to perform and that because no such written notice was ever given there occurred no such default of which FNB was required to notify Term Note holders. Such a construction of the above two sections of the indenture would mean that FNB was required to give noteholders notice of NAAC's failure to duly observe or perform any covenants or agreements in the indenture obligating NAAC in any way (except those listed as Events of Default in the other provisions of section 5.04) *only* when FNB decided to do so. Plaintiffs argue that such was not the case.

Sections 5.01 and 5.07, read together as a portion of Article Five—Remedies of the Trustee and Noteholders on Event of Default of the indenture, were inserted for the protection of noteholders. Section 5.07's mandate that FNB should give notice of defaults to noteholders listed one exception under which that notice could be withheld if FNB, in good faith, determined that action in the interests of the noteholders. No other exceptions were listed, indicating that the parties to the indenture did not intend to allow FNB to define for itself default by failing to perform its clear duty under section 5.01(c) to write NAAC when NAAC failed to comply with the requirements of the indenture. Moreover, section 5.01(c) defines a default as being a failure of NAAC to perform any covenants in the indenture for thirty days after NAAC has received written notice of such failure which *shall have been given* to NAAC by FNB. "Shall" is used in this section in the third person meaning that it has a special force from the fact that the writers (FNB and NAAC) predict or promise another's action, and hence is expressive of some authority or compulsion on the writers' part. Contrariwise, had "shall" been used in the first person in the indenture it would have expressed mere futurity. Webster's New International Dictionary 2300 (2d ed. 1960). The phrase "shall have been given" to NAAC by FNB thus indicates that the indenture intended FNB to give written notice of defaults to NAAC; there is no indication to the contrary that the decision to give notice was discretionary on FNB's part. Indeed, section 6.01 states that in the event of a default FNB *shall* exercise such of the rights and powers vested in it by the indenture, and use the same degree of care and skill in their exercise as a prudent man would exercise or use under the circumstances in the conduct of his own affairs.

The Court must conclude, on the basis of the sections of the agreement discussed above, that a default occurred each time NAAC failed to perform its covenants under the indenture and that it was FNB's duty to first notify NAAC of the default and later notify the noteholders if NAAC failed to rectify the default. Such a hold-

ing is a result of the Court's harmonizing the various sections of the indenture which it is the Court's duty to do unless the provisions are necessarily repugnant. *Western Oil Fields, Inc. v. Pennzoil United, Inc.*, 421 F.2d 387 (5th Cir. 1970). Consequently, defendant FNB's motion, based on its contention that it owed no contractual duties to plaintiffs under the indenture is DENIED. However, the Court cannot grant plaintiffs' cross motion, based on the contention that such duties were present, because section 6.01(b) of the indenture provides the Trustee with a good faith defense for errors of judgment, one of which may have been its failure to realize its contractual obligation to notify NAAC of default. The Court reserves this factual determination for trial and thus plaintiffs' cross motion is DENIED.

Defendant further argues that even if it owed contractual duties to plaintiffs for which it cannot assert a good faith defense, it is not liable because NAAC did not fail to comply with the indenture.

The issue then becomes: did NAAC comply with the indenture, and is it clear that if NAAC did not, FNB never gave the required notice of any NAAC breach thereof either to NAAC or to the noteholders except in February 1974, *after* NAAC filed for relief under the Bankruptcy Act.

■ In their statement of material facts as to which they contend there is no genuine issue to be tried plaintiffs, inter alia, list the following alleged facts:

Article III of the Indenture required NAAC to file with FNBA annually within ninety days after the close of each fiscal year an Officers' Certificate either denying or describing any default under, *inter alia,* Section 10.01.

Article IV of the Indenture required NAAC to file with FNBA, within 120 days after the close of its fiscal year, and to distribute to noteholders within 30 days thereafter, copies of its audited financial statements for the preceding year.

Article IV also required FNBA to mail to noteholders on or before October 31,

1971, and on or before October 31 of each year thereafter, an annual report including, *inter alia*, a statement of "the amount, interest rate, and maturity date of all other indebtedness owing by the Company—to the Trustee in its individual capacity on the date of such report. . . . ."

Annual Report Number One was not sent by FNBA until October 12, 1972. The Report made no mention of the amount NAAC owed FNBA on its line of credit.

The Supplemental Indenture (executed February 14, 1973) required NAAC to deliver to FNBA within thirty days after each March 31, June 30, September 30 and December 31 an Officer's Certificate stating there was no default under the Indenture and quarterly financial statements with an Officer's Certificate from the chief financial officer of NAAC stating that such statements were in conformity with generally accepted accounting principles.

In May 1973, FNBA was provided a quarterly financial statement by NAAC. FNBA was informed the June 30, 1972 financial statements had been restated to conform with generally accepted accounting principles. FNBA, and the noteholders, never received these statements and FNBA never requested that they receive them.

In August 1973, O–A, NAAC's accountants, diagnosed the transaction as a dividend to O–A, which violated the Supplemental Indenture. FNBA's Trust Officer in charge of NAAC never knew of the sale.

On September 7, 1973, FNBA was provided its *first* annual Officer's Certificate. Annual financial statements were not included, and were not timely furnished to FNBA or the noteholders as required by the Indenture, although FNBA knew they were overdue.

The only reports received by FNBA pursuant to the Indenture were financial statements for the year ending June 30, 1972 (but not the version restated to conform with generally accepted accounting

principles), the quarterly Officer's Certificate in May 1973, and annual financial statements for the year ending June 30, 1973 (not received until January 29, 1974).

Noteholders, after purchasing their Notes, never received *any* financial statements from NAAC or FNBA before February, 1974.

While the defendant does admit one violation of the indenture in its responses to the plaintiffs' statement of facts (that NAAC's annual financial statement for the year ending June 30, 1973, which under section 4.03(a) should have been filed with FNB by September 30, 1973, was not filed until January 29, 1974) it denies all others on the basis of differing interpretations of various provisions of the indenture and on contentions about a lack of support in the record for various allegations made by the plaintiffs. Defendant argues that the following material issues in the case need to be tried:

(a) If the record does not conclusively establish that Certificates required to be filed under Section 3.08 of the Indenture were in fact filed, then, when and whether those Certificates were filed with FNB by NAAC;

(b) If the Court does not find as a matter of law that the term "report" as used in Sections 4.03(a) and 4.03(b) does not refer to "financial statements", then whether the parties to the Indenture intended financial statements to be embraced within that term;

(c) If the record does not conclusively establish that NAAC did not convey "all or substantially all" of its assets, then, whether in fact it did so;

(d) If the Court does not find as a matter of law that FNB was not required to give notice to Noteholders under Section 5.07 of the Indenture regarding NAAC's failure to file certain quarterly financial statements when due in 1973 and 1974, then, whether any "event of default" occurred requiring notice to be given;

(e) If FNB failed to take any step it may have been required to take under the Indenture, whether FNB's failure in that regard amounted to an abuse of its discretion;

(f) If FNB failed to take some step it was required to take under the Indenture, whether in that regard, FNB failed to act as a prudent man would have acted under the circumstances;

(g) If FNB failed to take some step it should have taken under the Indenture, then, whether FNB's failure in that regard was attributable to a good faith error in judgment and, if so, whether FNB was negligent in ascertaining the pertinent facts underlying that judgment;

(h) If FNB failed to take some steps it should have taken under the Indenture, whether FNB's failure in that regard proximately caused any of the plaintiffs' alleged damages.

While the Court has determined as contemplated in (d) above that, as a matter of law, the indenture required FNB to give noteholders notice of NAAC's breaches of the indenture, it finds that whether or not those breaches occurred is a matter of fact which may best be finally determined at trial. Consequently, the Court DENIES plaintiffs' motion for summary judgment seeking a declaration of NAAC's breaches of the indenture and preserves determination thereof for trial.

As defendant points out, while plaintiffs have differentiated between FNB's alleged failure to notify noteholders of alleged events of default and FNB's alleged failure to require or request NAAC to provide noteholders with information required by the indenture, plaintiffs did not elaborate on the second point. Defendant argues that the information plaintiffs speak of did not have to be sent to the noteholders because it alleges that the indenture did not require audited financial statements to be sent to noteholders. The Court again states its belief that the determination of both what should have been sent the noteholders and whether it was sent would best be determined at a full trial of this issue. Consequently, plaintiffs' motion with respect to their second argument is DENIED.

■ Finally, the Court will examine plaintiffs' claim that FNB failed to declare the Term Notes due and payable when it knew NAAC had transferred substantially all its assets to its corporate parent. Defendant contends that plaintiffs have merely argued that NAAC "upstreamed" substantially all of its assets to O–A and that plaintiffs' allegations of NAAC sending certain dividends, loans, de facto dividends, and other transfers to O–A during the period from May through November 1972 do not force the conclusion that section 10.01's alleged prohibition against a sale or conveyance of all or substantially all of NAAC's assets to O–A was violated. The Court sees this matter as a factual one obviously material and in dispute and therefore preserves plaintiffs' allegations with respect thereto for trial; plaintiffs' motion for summary judgment under this claim is DENIED.

Having considered plaintiffs' claims under the indenture the Court now turns to plaintiffs' claims and defendant FNB's motion under the federal and state securities laws.

■ *Georgia Securities Act.* Plaintiffs contend that FNB is liable under section 13 of the Georgia Securities Act of 1957 because the 1973 NAAC Prospectus concerning NAAC Term Notes allegedly failed to contain "certified" financial statements as required by section 3 of that Act. Plaintiffs' argument rests on the fact that the Touche Ross audit report contained in the 1973 prospectus stated Touche's opinion that the financials contained therein "do not present fairly the financial position of the Company." According to plaintiffs, since such an adverse opinion was given, the financials in the prospectus were not "certified."

Defendant argues that the Georgia Act's certification requirement merely meant that the financials had to have been audited by a certified public accountant. Defendant's authority for this contention is found in two regulations of the SEC since no Georgia authority apparently exists. Defendant points to Reg. S–X which defines "audit" as:

The term "audit" (or "examination"), when used in regard to financial statements, means an examination of the statements by an accountant in accordance with generally accepted auditing standards for the purpose of expressing an opinion thereon.

17 C.F.R. § 210.1–02(d), and to another portion of that regulation which defines "certified" as:

The term "certified," when and in regard to financial statements, means examined and reported upon with an opinion expressed by an independent public or certified public accountant.

17 C.F.R. § 210.1–02(f). The Court finds these definitions essentially identical. Each involves an examination of financials by an accountant after which the accountant expresses an opinion. Neither "audit" or "certified" specifies that the accountant must opine that the financials present fairly the financial position of the company.

The Court finds persuasive defendant FNB's argument that the 1973 prospectus contained "certified" financial statements since it clearly contained "audited" statements and consequently GRANTS defendant's motion with respect to plaintiffs' claims under the Georgia Securities Act.

*Federal Securities Laws.* The Court is faced again with the question of whether FNB was a seller of NAAC notes under section 12 of the Securities Act. The Court has held above that under the guidance of *Pharo v. Smith,* 621 F.2d 656 (5th Cir. 1980), and *Croy v. Campbell,* 624 F.2d 709 (5th Cir. 1980), neither AGG nor Touche Ross were sellers. *Croy* requires more than participation in the sale of a security before one may be held to be a section 12 seller; *Croy* found participation to be a criterion in determining whether or not the defendant caused the transaction to take place. *Id.* at 714. Unless a genuine issue of material fact exists as to whether FNB caused plaintiffs to purchase Term Notes, defendant's motion for summary judgment with respect to this issue should be granted.

Plaintiffs contend that because FNB (1) authenticated Term Notes pursuant to the indenture; (2) allegedly failed to notify noteholders of NAAC's defaults under the indenture nor required NAAC to do so; and (3) did not receive an opinion from AGG that the February 1973 supplemental offering was exempt from federal registration, FNB was a seller. As fully discussed above with respect to AGG and Touche Ross, mere participation in some tangential aspects of the issuer's sales of securities do not render a party a seller. On the basis of *Croy* and *Westlake v. Abrams*, 504 F.Supp. 337 (N.D.Ga.1980), discussed above, the Court cannot find on the facts alleged by plaintiffs that FNB was a seller of securities as envisioned by section 12 of the Securities Act. Therefore, FNB's motion with respect to plaintiffs' section 12 claims is GRANTED.

With respect to plaintiffs' claims under section 17 of the Securities Act, the Court holds, as it has above, that no cause of action exists thereunder. *Gunter v. Hutcheson*, 433 F.Supp. 42 (N.D.Ga.1977). Defendant's motion with respect thereto is GRANTED.

*Trust Indenture Act.* Finally, the Court considered defendant's motion under the Trust Indenture Act of 1939. Plaintiffs have alleged a violation of section 306(a), 15 U.S.C. § 77fff, of that Act, and while the defendant has not argued the Act to be inapplicable for the reason the Court finds it inapplicable, the defendant has moved for summary judgment. As it held above with respect to AGG and Touche Ross, section 306(a) makes certain *sales* of securities unlawful unless the security has been or is to be issued under a qualified indenture. FNB made no sales of securities under the applicable judicial interpretations of the federal securities laws and thus cannot be liable for violations of section 306(a). Defendant's motion with respect thereto is therefore GRANTED.

In summary, the sole remaining claims against defendant FNB are those based on alleged contractual breaches under the indenture; all other claims have been dismissed.

As no motions now remain for the Court's consideration, the parties shall meet in person, prepare and file a pretrial order by June 15, 1981, in accordance with the Court's standard pretrial instructions. In addition to fulfilling the requirements thereof, the parties shall therein specify with particularity the issues of fact that require resolution at trial in the order such issues should be determined by the trier of fact.

The Court will continue to defer ruling on plaintiffs' motion for trial by jury until approval of the pretrial order.